Kimberly Sue AUSTIN, Appellant

v.

The STATE of Texas, Appellee.

No. 14–05–01012–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

April 10, 2007.

Nicole Wignall Deborde, Houston, for appellants.

Carol M. Cameron, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and SEYMORE.

## OPINION

LESLIE B. YATES, Justice.

Appellant Kimberly Sue Austin was convicted of felony injury to a child for injecting her young son with insulin and then sentenced to ninety-nine years' incarceration. The State's theory was that Austin suffered from Munchausen Syndrome by Proxy ("MSBP"), a mental condition describing a caregiver, often a mother of young children, who falsifies and/or induces illness in those cared for to gain attention and sympathy. In six issues, appellant challenges two of the trial court's evidentiary rulings and claims the trial court erred in refusing to grant a mistrial when a witness testified in violation of a pretrial motion in limine. We affirm.

## I. BACKGROUND

Appellant and her husband had four children: Noah Austin (the complainant), born on September 2, 1998; Joshua Austin, born on December 16, 1992; Robert Andrew Austin (hereinafter "Andrew"), born on August 31, 1991; and Brittany Austin, born on August 5, 1990. Joshua

died when he was seven months old, and the medical examiner ruled the death to be from Sudden Infant Death Syndrome ("SIDS"). Noah, Andrew, and Brittany have been living with relatives since September 2001 and are healthy.

In April 2000, appellant and her husband and children lived together with her husband's parents, Judith Austin and Robert Austin, Sr. (hereinafter "Robert"). Appellant was the primary caretaker of the children. Robert was ill and suffered from several conditions, including diabetes and dementia. He was insulin dependent and relied on others in the family, including appellant, to administer his daily insulin injections.

On April 10, 2000, Noah's father found him in distress, apparently having a seizure. Noah was stiff, cold, shaking, and convulsing, and his father called 911. Thereafter, Noah went into a deep coma and was admitted to a pediatric intensive care unit, where doctors discovered that he had a depressed glucose level and an elevated insulin level. After ruling out all possible natural causes for these conditions, doctors determined that Noah had been injected with insulin, and a bruised injection site was soon discovered on Noah's arm.

The doctors suspected that Noah was the victim of MSBP, and Children's Protective Services ("CPS") was called to investigate. Based on Noah's condition when his father found him, authorities determined that he had been injected with insulin at a time when appellant and Robert were the only adults in the house. Appellant admitted that she had access to insulin and often administered injections to Robert, but she denied injecting Noah. When asked to explain how Noah could have been injected, appellant blamed the hospital staff and suggested that Noah "must have rolled over on a needle in his bed." The CPS investigator observed that when appellant entered the room, Noah began to cry hysterically and did not calm down until appellant left.

This was not the first time CPS had investigated appellant and suspected MSBP. In September 1993, five weeks after Joshua's death, then two year-old Andrew was admitted to a hospital for accidental drug ingestion (this was the third time Andrew had accidentally ingested drugs), and appellant was caught under circumstances strongly indicating she had injected Coca–Cola into Andrew's IV line. Appellant denied doing this and, as with Noah, blamed the hospital staff. CPS investigated and removed the children from the home for six months. As part of the investigation, CPS requested that appellant undergo a psychological evaluation. The psychologist strongly suspected MSBP but stopped short of diagnosing it based on a lack of "concrete evidence" that she had "simulated or produced" illness in her children. Although the psychologist recommended that the children remain in protective custody, they were returned to appellant.

Though Joshua's death was initially attributed to SIDS, the investigation surrounding Noah led to suspicions that appellant was involved in Joshua's death. In 2002, Joshua's body was exhumed and re-autopsied, and the medical examiner discovered a mark and crystallized material consistent with an injection site. This, in combination with the injection of Noah, the incident with Andrew's IV line, and the pattern of medical incidents revealed in the children's medical records, led the medical examiner to issue a new death certificate showing Joshua's death was a homicide resulting from MSBP.

At trial, the State introduced two exhibits consisting of thousands of pages of medical records from each of appellant's four children. Using these records, five

doctors testified that Noah, Joshua, Andrew, and possibly Brittany were victims of MSBP. Each doctor based his or her opinion on some or all of these facts gleaned from medical records:

- the incident suggesting appellant injected Coca–Cola in Andrew's IV,
- specific instances of hospitalizations and surgeries with little or no objective verification of underlying symptoms,
- a general pattern of reported symptoms, such as vomiting and apnea, never verified by medical personnel, repeatedly occurring only when appellant was present, and of the type that can be induced by actions such as exposing the child to a foreign substance or smothering,
- a comparison of each children's medical contacts, showing, for example, a correlation between a decrease in one child's medical contacts with a simultaneous increase in another child's contacts,
- hundreds of total medical contacts for the four children, which is an abnormally high number of contacts in the absence of any underlying chronic medical condition, and
- the lack of hospitalizations, surgeries, or other evidence of serious, chronic medical problems at times when the children were not in appellant's care.

Appellant moved pretrial to exclude the children's medical records, arguing that the records constituted prior bad acts and were unfairly prejudicial and thus inadmissible under Texas Rules of Evidence 403 and 404(b). The trial court overruled appellant's objections and admitted the records as well as the medical testimony based on the records.

The State also introduced at trial an exhibit containing two sets of psychological evaluations of appellant conducted during the CPS investigations. The first set re-

lated to the 1993 investigation into tampering with Andrew's IV line, and the second evaluation was conducted by Dr. Lawrence M. Bramlette, a licensed psychologist, after Noah's insulin injection. Dr. Bramlette also strongly suspected appellant had MSBP but stopped short of making a definitive diagnosis without having a medical professional review all of the children's medical records. In reaching his conclusions, Dr. Bramlette relied in part on the first evaluation, which contained a summary of an interview with Robert Austin, Sr. in which he made many negative statements regarding appellant, including criticizing her parenting skills, accusing her of stealing his insulin, and stating that she lied about everything. Appellant objected on hearsay grounds and under Rule 404(b) to admitting this interview summary, but the trial court overruled appellant's objections.

Appellant also moved pretrial to exclude any mention of the circumstances of Joshua's death and the findings from the second autopsy. In the pretrial hearing, appellant presented testimony from another medical examiner, who criticized the change in the death finding to a homicide and said the finding should have been changed only to "cause undetermined" rather than stating the death resulted from MSBP. The trial court excluded not only evidence of the re-autopsy and change in cause of death but prohibited any evidence that Joshua had died, ruling that it would be too prejudicial. The trial court allowed only testimony that appellant had no further contact with Joshua as of July 28, 1993, which is the date Joshua died. Despite ordering the prosecutor to instruct all witnesses regarding this ruling, the prosecutor failed to instruct Judith Austin, the children's grandmother, who, near the end of the final day of testimony, stated that Joshua had died. The defense moved for a mistrial, which the trial court denied

after thoroughly instructing the jury to disregard and polling each individual juror, who indicated they could follow the trial court's instruction.

The jury convicted appellant, and this appeal followed. On appeal, appellant challenges the trial court's admission of her children's medical records, the admission of the summary of the interview with Robert, and the trial court's refusal to grant a mistrial.

## II. ANALYSIS

### A. Evidentiary Issues

██ We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim.App.2000). We will reverse a trial court's decision to admit or exclude evidence only when that decision falls outside the zone of reasonable disagreement. *Id.*

#### 1. Children's Medical Records

In her first two issues, appellant argues the trial court erred in admitting the medical records of her four children and testimony regarding those records. She claims that admission of this evidence, which the State used to support its theory that appellant had MSBP based on her conduct toward Noah and her other children, violated Texas Rule of Evidence 404(b)'s general prohibition of evidence of extraneous bad acts. She also contends that even if admissible under Rule 404(b), the evidence should have been excluded as unfairly prejudicial under Texas Rule of Evidence 403. We address each argument in turn.[1]

#### a. Rule 404(b)

██ Rule 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Tex.R. Evid. 404(b). However, such evidence may be admissible for other purposes, such as "proof of motive." *Id.; accord Wyatt v. State,* 23 S.W.3d 18, 26 (Tex.Crim.App.2000). Although only one Texas court has done so, courts around the country have struggled with the evidentiary issues arising in MSBP cases, and they have consistently allowed the prosecution to use evidence showing a defendant had MSBP to explain motive. *See, e.g., Reid v. State,* 964 S.W.2d 723, 730 (Tex.App.-Amarillo 1998, pet. ref'd); *People v. Phillips,* 122 Cal.App.3d 69, 175 Cal.Rptr. 703, 712 (1981); *State v. Hocevar,* 300 Mont. 167, 7 P.3d 329, 346–47 (2000); *People v. Coulter,* 182 Misc.2d 29, 697 N.Y.S.2d 498, 500 (1999); *State v. Cutro,* 365 S.C. 366, 618 S.E.2d 890, 895 (2005). We agree that such evidence does not violate Rule 404(b). "[A]lthough a prosecutor ordinarily need not prove motive as an element of a crime, the absence of an apparent motive may make proof of the essential elements of a crime less persuasive." *Reid,* 964 S.W.2d at 730. Evidence suggesting appellant had MSBP was helpful to the jury in understanding why this otherwise seemingly caring and devoted mother would intentionally inject her son with unnecessary insulin. As the *Reid* court explained,

1. The State claims appellant failed to preserve error regarding these two issues because she did not specify, either to the trial court or to this court, exactly which portions of these thousands of pages of records she claims are inadmissible. We disagree. Appellant's arguments are specific enough to put the State on notice that she challenges the State's entire theory of using her children's medical records to establish MSBP. Though highlighting particular incidents, the State did not rely on isolated incidents but on the overall pattern of behavior established by analyzing the entire set of records. Appellant's trial court objection and appellate briefing are consistent with how the State tried the case. We conclude that appellant has preserved error regarding her first two issues.

In the absence of a motivational hypothesis, and in light of the other information which was before the jury concerning appellant's demeanor, personality and character, including the fact that she was the mother of the child, without other relevant and reliable evidence, the conduct ascribed to appellant was incongruous and apparently inexplicable. MSBP testimony would, if accepted by the jury, bridge that gap.

*Id.; accord Phillips,* 175 Cal.Rptr. at 712. Thus, because appellant's children's medical records helped establish motive by showing MSBP, their admission did not violate Rule 404(b).[2]

In addition to helping to explain motive, admission of the children's medical records was permissible under Rule 404(b) to provide context to the crime. " '[T]he jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum.' " *Prible v. State,* 175 S.W.3d 724, 732 (Tex.Crim.App.) (quoting *Moreno v. State,* 721 S.W.2d 295, 301 (Tex.Crim. App.1986)), *cert. denied,* 126 S.Ct. 481, 126 S.Ct. 481, 163 L.Ed.2d 367 (2005). Thus, evidence of extraneous matters is admissible as same transaction contextual evidence under Rule 404(b) if it "is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Id.; see also Gregory v. State,* 56 S.W.3d 164, 177 (Tex. App.-Houston [14th Dist.] 2001, pet. dism'd) (noting that evidence of extraneous acts was admissible because "it was essential for the jury's understanding of the circumstances and the context of events"). Appellant argues the context exception is inapplicable because the primary facts of this case—a child was injected with insulin—can be understood on their own. However, the actions revealed in the children's medical records were not wholly separate from the offense but place it in context, showing that appellant's injection of Noah was not an isolated event but part of a larger pattern of conduct toward her children. Prosecuting appellant without this evidence would certainly have made the State's case more difficult to understand, and thus the evidence was admissible under Rule 404(b) on this basis as well. *See Prible,* 175 S.W.3d at 732; *Gregory,* 56 S.W.3d at 177.

Appellant claims that evidence of her MSBP is classic conformity evidence, admitted to show she acted consistent with a character trait. She argues this is no different than showing, for example, that a defendant had kleptomania to explain why he committed theft. We disagree. MSBP describes not appellant's character but her behavior toward her children. *See Hocevar,* 7 P.3d at 346 (rejecting defendant's comparison of MSBP to kleptomania). Further, the evidence was not admitted to show character conformity but, as explained above, to explain motive and give context to appellant's otherwise inexplicable actions. *See Camacho v. State,* 864 S.W.2d 524, 532 (Tex.Crim.App.1993) (commenting that same transaction contextual evidence "is admissible, not for the purpose of showing character conformity, but to illuminate the nature of the crime alleged"); *Swarb v. State,* 125 S.W.3d 672,

---

2. Appellant argues that the motive exception does not apply here because Dr. Bramlette testified that what motivates people with MSBP is not completely understood. Although the motivation of many criminals may be difficult to understand, the general admissibility of motive evidence is well established. Further, motive evidence need only "tend to raise an inference that the accused had a motive to commit the alleged offense." *Bisby v. State,* 907 S.W.2d 949, 958 (Tex.App.-Fort Worth 1995, pet. ref'd). Thus, even if the MSBP evidence did not conclusively establish appellant's motive, the evidence at least tended to raise an inference regarding it.

681 (Tex.App.-Houston [1st Dist.] 2003, pet. dism'd) (noting that same transaction contextual evidence is admitted "to put the instant offense in context," not to show that the appellant committed the charged offense merely because he also committed the extraneous offense). The present case is different than a typical theft case, where evidence of an underlying mental condition would not assist the jury in understanding the offense. We conclude the trial court did not abuse its discretion in admitting the children's medical records and accompanying testimony under Rule 404(b). We overrule appellant's first issue.

**b. Rule 403**

■ Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." In her second issue, appellant argues that even if her children's medical records were admissible under Rule 404(b), they should have been excluded as unfairly prejudicial under Rule 403. In conducting a Rule 403 analysis, the court is to consider (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. *Prible*, 175 S.W.3d at 733.

Hearing that appellant repeatedly induced and falsified illnesses in her children, leading to unnecessary hospitalizations and surgeries, could have affected the jury in an emotional way. Also, even

though the State did not discuss each one of the voluminous medical records in detail, half of its witnesses spent significant time testifying about matters contained in the records. Thus, the second and third factors weigh in appellant's favor. However, the other factors clearly weigh in favor of admissibility. Showing appellant had MSBP was critical to establish a motive for injecting Noah, and the State would have been unable to do so without the children's medical records. *See Reid*, 964 S.W.2d at 732 (rejecting Rule 403 as basis for excluding MSBP evidence); *Hocevar*, 7 P.3d at 347 (same). Moreover, the evidence was necessary to provide context for the offense, and "the prejudicial effect of evidence will rarely render it inadmissible if it proves the context of the offense." *Lockhart v. State*, 847 S.W.2d 568, 572 (Tex.Crim.App.1992); *accord Nguyen v. State*, 177 S.W.3d 659, 668 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). Though the evidence was undoubtedly prejudicial to appellant, it was not unfairly so. We conclude the trial court did not abuse its discretion in admitting appellant's children's medical records and accompanying testimony over appellant's Rule 403 objection, and thus we overrule appellant's second issue.

**2. Interview of Robert Austin, Sr.**

In her third, fourth, and fifth issues, appellant challenges the trial court's admission of a summary of an interview with Robert during a 1994 psychological evaluation of appellant.[3] This interview sum-

---

**3.** Appellant mentions in her brief that this first psychological evaluation contains "comments and statements made by appellant's family members, including Robert Austin, Sr." Her brief then focuses exclusively on the Robert interview summary. The State argues appellant has waived error regarding statements in the evaluations made by any family members other than Robert because of inadequate briefing. We do not interpret appellant's brief as raising an issue as to these

other statements, but to the extent her brief can be so interpreted, we agree with the State that such arguments would be waived. *See* TEX. R. APP. P. 38.1(h). The State also argues that appellant waived her Rule 404(b) argument by failing to itemize to the trial court the specific prior bad acts she contests. It is apparent from the context of her objection that appellant was complaining about the entire interview summary, which is basically a list of accusations of bad conduct. We find

mary recounts Robert's negative opinions about appellant, including:

- He accused appellant of stealing insulin from his insulin bottle.
- He stated that appellant had "a history of lying" and that she "will lie about everyday things such as whether or not the mail has come for the day."
- He would not eat food in his house because he was afraid appellant would put something in the food.
- He said that appellant had "a habit of drawing attention to herself."
- He believed appellant had given something to Andrew to make him sick.
- He said that appellant often did not perform everyday parenting tasks and "didn't care who kept her kids as long as she don't have to."

Appellant claims the interview summary is hearsay and that its admission violates the Confrontation Clause as well as Rule 404(b).

### a. Confrontation Clause

■■■ In her fourth issue, appellant claims admission of the interview summary violates her right to confront witnesses because Robert was deceased at the time of trial and therefore unavailable for cross-examination. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The State responds that appellant did not object on this basis to the trial court and therefore has not preserved this issue for review. We agree with the State and find appellant has not preserved error on her confrontation complaint.

When the State offered the psychological evaluations, appellant initially objected that the Robert interview summary was "obviously hearsay" and being "offered for the proof of the matter contained." The State responded that Robert gave the interview to a psychologist who was evaluating appellant's mental status and thus it was admissible under Texas Rule of Evidence 803(4) as a statement made for the purposes of medical diagnosis or treatment. Appellant's attorney then further explained her objection:

As the Court is aware, Mr. Austin, Sr. is not available to be cross-examined as to whether or not he said these things, that sort of stuff. What we are faced with is a situation where the jury, as well as everyone else in this courtroom, is going to have to accept that these statements were made exactly this way, that the intent is exactly as it's expressed here. And, frankly, Judge, they are fairly prejudicial. There are a lot of opinions that are expressed in here, nothing that is subjective or can be objectively verified. There are a lot of opinions about her. We feel that those—while the doctor has the ability to consider those and can incorporate those within the context of his diagnosis or opinions, the fact that they are included in here, we believe, is beyond the scope of the hearsay exception.

■■■ To preserve a complaint for appellate review, the complaining party must state the grounds for the desired ruling to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R.APP. P. 33.1(a)(1)(A); *Reyna v. State,* 168 S.W.3d 173, 177 (Tex.Crim.App.2005). A hearsay objection does not preserve error on Confrontation Clause grounds. *Reyna,* 168 S.W.3d at 179; *Lopez v. State,* 200 S.W.3d 246, 255 (Tex.App.-Houston

appellant's objection to be sufficiently specific to preserve error in this case. *See* TEX. R.

APP. P. 33.1(a)(1)(A).

[14th Dist.] 2006, pet. ref'd). Appellant argues that the reference to the inability to cross-examine the declarant was sufficient to make the confrontation grounds of her objection apparent. We disagree. The context of the argument shows appellant's attorney briefly mentioned cross-examination only in the context of making a hearsay objection. Even if such a minor reference to cross-examination could be construed to include a Confrontation Clause objection, "[w]hen a defendant's objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error." *Reyna*, 168 S.W.3d at 179; *see also Taylor v. State*, No. 06–05–00033–CR, 2006 WL 66515, at *2 (Tex.App.-Texarkana Jan.13, 2006, no pet.) (mem. op.; not designated for publication) (finding that when defendant "[a]rguably, but only tangentially, while arguing his hearsay objection, ... briefly touched on a claim that the evidence's admission violated the Confrontation Clause," he failed to preserve error). Because she failed to preserve error, we overrule appellant's fourth issue.

### b. Evidentiary Rules

#### (i) Rule 803(4)

■■■ In her third issue, appellant argues that Robert interview summary was not admissible under Texas Evidence Rule 803(4). Rule 803(4) provides that statements "made for purposes of medical diagnosis or treatment" are not excluded by the hearsay rule. This exception is based on the assumption that such statements are reliable because the speaker appreciates that the correctness of the diagnosis or effectiveness of the treatment may depend on the accuracy of the information given the doctor. *See Ware v. State*, 62 S.W.3d 344, 350–51 (Tex.App.-Fort Worth 2001, pet. ref'd); *Fleming v. State*, 819 S.W.2d 237, 247 (Tex.App.-Austin 1991, pet. ref'd). Thus, the declarant's

motive in making the statement must be consistent with the purpose of promoting treatment. *Jones v. State*, 92 S.W.3d 619, 623 (Tex.App.-Austin 2002, no pet.); *Sandoval v. State*, 52 S.W.3d 851, 856 (Tex. App.-Houston [1st Dist.] 2001, pet. ref'd).

The State argues that the interview summary was admissible under Rule 803(4) because Dr. Bramlette used it in conducting his psychological evaluation of appellant. The State, however, fails to account for the speaker's motive in making the statement. Nothing in the record suggests that Robert made the statement for the purpose of diagnosing or treating appellant's mental condition. In fact, his wife told the interviewer that they came to CPS because they wanted possession of appellant's children. This purpose is not necessarily consistent with accurately assessing appellant's mental status in that the more negatively Robert portrayed appellant, the better his chances of gaining possession of her children. *See Smith v. State*, 88 S.W.3d 643, 652 (Tex.App.-Tyler 2000) ("Unlike facts related by the patient herself, facts related by a third party whose motives may be suspect do not bear the same indicia of reliability."), *vacated on other grounds*, 61 S.W.3d 409 (Tex.Crim. App.2001); *see also Jones*, 92 S.W.3d at 623 ("[T]he declarant must first have a motive consistent with obtaining medical care, knowing that proper diagnosis or treatment depends on the veracity of such statements."); *Sandoval*, 52 S.W.3d at 856 ("[T]he declarant's motive in making the statement must be consistent with the purpose of promoting treatment."). Thus, we conclude the interview summary was not admissible under Rule 803(4).

#### (ii) Rule 705(a)

■■■ Even if the trial court gives a wrong reason for its ruling, we must uphold the ruling if it is correct under any applicable legal theory supported by the

record. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex.Crim.App.2003). Thus, although the State argues that the interview summary was admissible under Rule 803(4), it argues in the alternative that the interview summary was also admissible to show the basis of an expert opinion. *See* TEX. R. EVID. 705(a). Rule 705 provides that if the underlying data would be otherwise inadmissible, "the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial." TEX. R. EVID. 705(d). Dr. Bramlette testified that background information, such as interviews with appellant's family members, was important in his assessment of appellant and whether she had MSBP. Most of Robert's statements—particularly regarding appellant's lying, drawing attention to herself, and intentionally making Andrew sick—directly support Dr. Bramlette's opinions. Disclosing this information assisted the jury in evaluating the weight to give Dr. Bramlette's opinions. *See Ramirez v. State*, 815 S.W.2d 636, 651 (Tex.Crim.App.1991) ("Disclosing this information enables the jury to evaluate the expert's opinion and ascertain the weight it wishes to attach to such testimony."). Although the statements are prejudicial and there is some risk the jury could use them for another purpose, we conclude this risk does not outweigh their value as explanation and support for Dr. Bramlette's opinions. Thus, the Robert interview summary was admissible under Rule 705, even if it was otherwise inadmissible.[4]

### c. Harm Analysis

4. In her fifth issue, appellant argues the evidence was also inadmissible under Rule 404(b), arguing that the extraneous conduct Robert described was being admitted to show appellant acted in conformity therewith. Be-

Even though we have concluded that the interview summary was admissible to show the basis of the expert's opinion, in the alternative, we conclude that even if the Robert interview summary should not have been admitted under any legal theory, any such error was harmless. Because appellant did not preserve her Confrontation Clause objection, any error in the evidentiary ruling was non-constitutional. *See Bagheri v. State*, 119 S.W.3d 755, 763 (Tex.Crim.App.2003). Thus, we must disregard this error if it did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 875–76 (Tex.Crim.App. 2007). A substantial right is affected when an error has a " 'substantial and injurious *effect or influence in determining the jury's verdict.*' " *Scott v. State*, No. 14–05–01129–CR, 222 S.W.3d 820, 826, 2007 WL 1080579, at *4 (Tex.App.-Houston [14th Dist.] Apr. 12, 2007, no pet. h.) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997)). We must examine the record as a whole to determine if the error had no influence on the jury or had but a slight effect. *See Casey*, 215 S.W.3d at 885–86; *Scott*, 222 S.W.3d at 826, 2007 WL 1080579, at *4. Important factors include the nature of the evidence supporting the verdict, the character of the alleged error, how the error might be considered in connection with other evidence in the case, and whether the State emphasized the error. *See Bagheri*, 119 S.W.3d at 763; *Scott*, 222 S.W.3d at 826, 2007 WL 1080579, at *4.

After examining the record as a whole, we find that any error in admitting the interview summary was harmless. Although Robert's comments re-

cause we have already concluded the evidence is admissible under Rule 705(a) even if otherwise inadmissible, we need not address this issue.

garding appellant were quite negative, the jury already had substantial evidence that appellant had, for nearly ten years, feigned or induced repeated illnesses in her four children, resulting in multiple unnecessary hospitalizations, medications, and surgeries. Further, appellant was one of only two adults in the house with Noah during the time he was injected, and she admittedly had access to insulin and knew how to administer insulin injections. The State never specifically mentioned the interview summary during trial, and none of the witnesses emphasized any of Robert's statements. Thus, even though the jury requested to view the entire psychological evaluation file during deliberations,[5] given the small role this evidence played in the trial, especially in relation to the other evidence supporting the verdict, we conclude the evidence did not influence the jury or had only a slight effect. Appellant argues that even if the error was harmless in the guilt/innocence phase, she was harmed during punishment because, "despite being eligible for probation, [she] received the highest punishment possible, other than a life sentence." However, during punishment, the State introduced detailed evidence, without objection, regarding Joshua's death, the exhumation and re-autopsy of his body, and revised cause of death finding reflecting that Joshua's death was a homicide resulting from MSBP. In light of this evidence, we cannot say that Robert's negative comments about appellant caused the jury to recommend a greater sentence than it would have otherwise.

## B. Mistrial

 After lengthy pretrial discussions, the trial court granted appellant's motion in limine, ruling that the State could not mention Joshua's death and instructed the State to admonish all its witnesses to avoid testifying about that issue. However, the prosecutor failed to admonish Judith Austin, who testified on the last day of trial as follows:

Q: Well, you just said you didn't usually have any concerns about [the children] being with [appellant] or suspicions about her. Tell us about the times you did have concerns or suspicions.

A: Only one time.

Q: When was that?

A: Well, my husband and I were going with his mother to the funeral of a cousin in Smithville. And before I left, I said, we should have taken Joshua with us. Maybe I ought to ask, but I didn't. And he was sick that afternoon and then he died later.

Appellant's counsel objected, and before the trial judge excused the jury to confer with the attorneys, he gave the following instruction to the jury:

Members of the jury, I am going to have to excuse you. It's very, very important, don't even—when you go across the hallway, don't even think about the last response by Ms. Austin at all. You will be instructed to disregard it in just one moment, but we need to clear up a few things. Don't even think about it. That's not relevant in this case at all, and we will talk about it in just one moment.

Appellant's counsel requested an instruction to disregard, which the trial court granted, and moved for a mistrial, which the trial court denied. When the jury returned, the trial judge instructed the jury as follows:

5. In its brief, the State claims that any error must be harmless because the jury never viewed or requested the psychological evaluation exhibit, but this is incorrect.

Members of the jury, this happens from time to time, that certain testimony is brought out before the jury that should never, ever—and I mean ever be brought out before the jury. It was unresponsive. The witness was not warned to not go in that area, so don't hold it against Mrs. Austin. It's not her fault.

It was brought before you. I can't be any stronger in admonishments to you. It's important to please understand this. This last response concerning—I am going to say it—Joshua's death, because it's been brought out by the witness, that's in no way—I mean in no way—to be considered by anyone on an individual basis. You put that out of your mind individually and certainly as a group of 12 people deliberating tomorrow morning about this case.

If you don't think you can do it in the morning, let me know and I am going to declare a mistrial. And during deliberations, if anyone brings it up one time while you are deliberating, I want the other 11 to write me a note saying a juror has brought this up, and I will bring you back in in the next minute and declare a mistrial. It is that important. And I hope you understand your responsibilities as a juror. You are to consider only what the Court decides is relevant in this case, because if you can't, we decide cases upon speculation [sic], and that's the last thing in the world we ever want to do in a case such as this, or any other case down here, whether we're in county court or up in district court. It's that important.

So, do some soul searching tonight. If you don't think you can put it out of your mind, let me know in the morning and I will declare a mistrial. If anybody in deliberations brings that up, the other 11 please write me a note and I'll bring you out. I'm not going to be upset with anybody for not being able to put it out

of their mind. I will just have to declare a mistrial.

I'm going to count on you. If you can do it, fine. If you can't do it, that's fine also. We'll start over this case again next week. It's that important to confine your interpretation of the evidence solely to what has been admitted before you, what the Court feels is proper consideration by the jury.

Ms. Austin then finished her testimony, and the State presented one last witness who provided brief testimony. Before dismissing the jury for the day, the trial judge further admonished the jury.

Ladies and gentlemen, it's been a long day. Do me a favor, as I said, it is that important, do some soul searching, each one of you, over the evening. Don't talk to anybody about what has happened and what I have asked you to do. And in the morning, after both sides have rested and both sides have closed, before the argument of counsel, before I charge you on the law, I am going to ask each one of you: Do you think you can give the Court your complete assurance, more than just "I think," that you cannot consider the statement by Mrs. Judith Austin in any way, in any way in deciding your own individual fact-finding of this case, along with, of course, the participation of the other jurors.

And I guarantee you, if you say, no, I can't put it of [sic] out of my mind, no one is going to get upset with you at all, but I'm going to declare a mistrial. I'll tell you that much right now, because that was in violation of an order that the Court issued even before the jury selection process.

I'll leave it up to you. Do some soul searching. Again, no matter what you decide, no one is going to fault you in any way. That's for sure. And I will leave it up to you in the morning to let me know.

The next morning, the State's final witness concluded her testimony, and the trial judge again addressed the jury.

> Right now, I have to go back to the issue that was brought up yesterday with Mrs. Austin's testimony. I've asked you to think about it. I mean, it sounds like a cliche, do some soul searching, but that's exactly what I wanted you to do. Give me your best, your most honest, your most candid response. Because it is that important.
>
> I am going to ask each of you—and I have to do this individually. I am going to ask each of you—I tell you what. Let me do this, I am going to ask the alternates to take these two last seats. I'm sorry.
>
> What I need to do now, I am going to call out your name and ask you to please stand where you are. I will ask you individually: Can you—and this is for all of you—can you follow the instructions by the Court to disregard in any way the one response by Mrs. Austin concerning Joshua.
>
> If you can, just say, "Yes, I can." If you cannot, just say, "No, I cannot." That's all I need to know at this time. I hate to spotlight you like this, but it has to be done according to procedures.

The trial judge then polled each individual juror, and each juror answered that he or she could follow the court's instruction.

In her sixth issue, appellant argues the trial court erred in denying her motion for mistrial. We review a trial court's denial of a motion for mistrial for abuse of discretion. *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex.Crim.App.2004); *Hudson v. State,* 179 S.W.3d 731, 738 (Tex.

App.-Houston [14th Dist.] 2005, no pet.). "A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins,* 135 S.W.3d at 77 (quoting *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App. 1999)). Mistrial is required "[o]nly in extreme circumstances, where the prejudice is incurable." *Id.; see also Hudson,* 179 S.W.3d at 738 ("A mistrial is an extreme remedy for prejudicial events that occur at trial and should be exceedingly uncommon."). In analyzing whether the prejudicial event is so harmful that the case must be redone, we consider (1) the prejudicial effect, (2) the curative measures taken, and (3) the certainty of conviction absent the prejudicial event. *See Hawkins,* 135 S.W.3d at 77 (citing *Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App.1998)). A prompt instruction to disregard will usually cure any prejudice resulting from improper testimony regarding an extraneous offense, even if given in violation of a motion in limine. *See Hinojosa v. State,* 4 S.W.3d 240, 253 (Tex.Crim.App.1999); *Herrero v. State,* 124 S.W.3d 827, 836 (Tex. App.-Houston [14th Dist.] 2003, no pet.).

Appellant argues the trial court abused its discretion in refusing to grant a mistrial because the evidence regarding Joshua's death was so prejudicial that it was impossible for the jury to disregard. *See Kemp v. State,* 846 S.W.2d 289, 308 (Tex.Crim. App.1992). She asserts that the trial court's extensive efforts to cure the prejudice both demonstrate the inflammatory nature of the evidence and actually made the situation worse by repeatedly calling more attention to the evidence.[6] Thus, she

6. Appellant also asserts that the State intentionally asked suggestive questions to a witness it had failed to admonish not to discuss Joshua's death, thereby engaging in misconduct that magnifies the prejudice. This court has previously considered whether a prosecu-

tor solicited the improper testimony as a factor in determining whether the trial court erred in refusing to grant a mistrial. *See Hudson,* 179 S.W.3d at 738. The prosecutor denied intentional misconduct and explained that he had forgotten to admonish the witness

claims she was entitled to a new trial. We disagree.

Though evidence of Joshua's death was certainly prejudicial, the prejudicial impact is lessened by considering this evidence in the context of the entire trial. The jury had already heard extensive evidence that appellant had, directly and indirectly, repeatedly injured each of her children, including injecting Noah with insulin and sending him into a coma. Further, the judge's instruction to disregard was prompt, unequivocal, and forceful. *See Hudson*, 179 S.W.3d at 738–39. We are to presume the jury followed these instructions. *See Hinojosa*, 4 S.W.3d at 253; *Herrero*, 124 S.W.3d at 836; *see also Waldo v. State*, 746 S.W.2d 750, 753 (Tex.Crim. App.1988) (noting that "this court puts its faith in the jury's ability, upon instruction, consciously to disregard the potential for prejudice, if any, in its deliberations" (internal quotation marks omitted)). Beyond this presumption, the trial judge polled each juror, and they all said they could follow the instruction.[7] Though the evidence of Joshua's death was inflammatory, we disagree that it was so inflammatory that, despite what each juror told the trial judge, the jury could not ignore it. Appellant asserts that the judge's efforts to cure the prejudice actually exacerbated it, but she never complained to the trial court or asked for less extensive corrective measures. Further, she cites no authority showing that a judge should be criticized for taking extensive steps to remedy an unfortunate situation. Indeed, we must put faith in the jury's ability to disregard prejudicial events when so instructed, and surely a judge's efforts to explain and emphasize to the jury the importance of this obligation should be commended. Moreover, given the egregious nature of the charged offense and the volume of evidence supporting appellant's guilt, even without any mention of Joshua's death, conviction was fairly certain.

The evidence of Joshua's death, though prejudicial, was only incrementally more damaging than the evidence already before the jury. The trial judge gave extensive instructions to disregard, which every juror said he or she could follow. Under these circumstances, including the nature of the offense and evidence supporting guilt, the judge acted reasonably in believing his instructions to disregard were effective to cure any prejudice from the remark. Thus, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial, and we overrule appellant's sixth issue.

## III. CONCLUSION

The trial court did not abuse its discretion in admitting appellant's children's medical records and the summary of the interview with Robert Austin, Sr. or in refusing to grant appellant's motion for a

---

because (1) he had no contact with her pretrial, given that she was a member of appellant's family,(2) he had called her to testify at the last minute, and (3) he had expected her to testify the next morning rather than the end of the day and had planned to talk with her in the morning. The trial judge did not find that the prosecutor had engaged in intentional misconduct, instead scolding him that he should have gotten help in preparing and trying the case. Given the information before the judge, we cannot say he abused his discretion in failing to find intentional misconduct.

7. Several courts have considered jurors' assurances upon being polled that they could follow the trial court's instructions as a factor in determining whether a mistrial was required. *See, e.g., Perkins v. State*, No. 74,318, 2004 WL 3093239, at *2–3 (Tex.Crim.App. June 30, 2004), *cert. denied*, 543 U.S. 1164, 125 S.Ct. 1330, 161 L.Ed.2d 136 (2005); *Bustamante v. State*, 106 S.W.3d 738, 742, 744 (Tex.Crim.App.2003); *Grotti v. State*, 209 S.W.3d 747, 777 (Tex.App.-Fort Worth 2006, pet. filed); *Jones v. State*, 100 S.W.3d 1, 5 n. 3 (Tex.App.-Tyler 2002, pet. ref'd).

mistrial. We affirm the trial court's judgment.