COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| DAVID EDUARDO GARZA, | | No. 08-07-00243-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 394th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Presidio County, Texas |
| | § | |
| Appellee. | | (TC # 2979) |
| | § | |

**O P I N I O N**

David Eduardo Garza appeals his conviction of aggravated robbery. Appellant waived his right to a jury trial and entered a non-negotiated plea of *nolo contendere*. The trial court found Appellant guilty and assessed punishment at life imprisonment. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Following Appellant's plea of *nolo contendere*, the State offered evidence pertaining to the instant offense, the aggravated assault of Billy Massie in Presidio County. Additionally, the State tendered evidence demonstrating that the aggravated assault was one of a series of offenses which took place between July 9 and July 13 of 2006. The first offense was the murder of Appellant's wife, Julie Garza, in San Antonio.

On July 9, 2006, Virginia Gonzales, a friend of Julie's, received a telephone call from Julie's sister stating that she had been unable to reach Julie. As a result, Gonzales went to Julie's home around 10 p.m. to check on her. The lights and television were on and Julie's vehicle was at the

residence, but she did not come to the door. Concerned, Gonzales called Julie's sister and the police. She also searched the neighboring area for Appellant's white vehicle. As she returned to the Garzas' home, Appellant arrived. She asked him where Julie was, and he replied that she was inside asleep. Gonzales noticed that Appellant had Julie's cell phone and she asked him why he had it. Appellant claimed that his wife had lent it to him, but Gonzales did not believe him since she knew they were having marital problems. Appellant told Gonzales that he would go inside and check on his wife and he asked Gonzales to wait outside. When he returned, he told Gonzales that Julie wasn't home. Gonzales replied that she wanted to look inside but he would not let her in, telling her repeatedly that Julie wasn't there. Gonzales refused to leave and Appellant finally let her in. She looked inside every room except for the bathroom because Appellant stopped her, admitting he had drugs stored there. When Gonzales saw Julie's purse on the sofa, she again asked Appellant to let her look in the bathroom but he refused. At this point, Gonzales left the residence and called the police because she knew Julie would not leave her home without her car or purse. She waited for the police and followed them to the Garzas' home. On July 30, Gonzales returned to the residence to collect Julie's belongings. She found some men's clothing in the bedroom which she turned over to a crime scene technician.

Officer Rodney Lucas of the San Antonio Police Department went to the Garzas' home on July 9 at 11:19 p.m. to check on Julie's welfare. When he kicked open the door, he saw that a chair had been placed under the doorknob. Lucas found Julie's body in the bathroom.

The medical examiner, Dr. Jennifer Rulon, determined that the cause of death was asphyxiation and the manner of death was homicide. She also found that the victim had blunt force trauma injuries on her head and face, abrasions around her nostrils and on the inside of her lip, abrasions and contusions on her hands, arms and legs, a bloody torn fingernail, and a tearing injury

of the rectum. Dr. Rulon noted the presence of petechiae in the eyes which is generally associated with strangulation or neck compression. On cross-examination, the defense inquired whether the cause of death determination would be different had she not received additional information from the police. Dr. Rulon explained that homicidal asphyxiation would be in the differential but the cause of death would be undetermined. On re-direct, Dr. Rulon explained that her opinion was based on many factors, including information provided to her by the law enforcement investigators, who had informed her that Appellant confessed to strangling his wife by compressing her neck.

On July 30, Archie Anz, a crime scene technician with the San Antonio Police Department, returned to the victim's residence and recovered a navy blue tee shirt and white sweatpants which had been found by Gonzales in the victim's bedroom. The DNA of both the victim and Appellant were recovered from bloodstains found on both items of clothing.

On July 12, 2006, David Duncan, a Texas Ranger with the Texas Department of Public Safety, investigated a wreck involving a white 1999 Pontiac Trans Am near Nunn Hill, which is about 31 miles north of Fort Davis on Highway 118. The car had run off of an embankment and traveled to the bottom of an arroyo. The air bags had deployed and there were no keys in the vehicle. The car was subsequently removed from the location and towed to a storage lot in Fort Davis. The vehicle was registered to Hector Garza in San Antonio. Inside the car, Duncan found Julie's check book and a July 10 credit card receipt from a convenience store in Marfa bearing Julie's name. After Appellant was apprehended and interviewed by law enforcement officers, he told them where he had hidden his belongings after wrecking the car. The officers went back to the scene of the accident and located these items, which included a key ring bearing the name "Garza."

Billy Massie was employed as a loan officer with the Federal Land Bank. On July 13, 2006, Massie left his office in Marfa to inspect a property located on the loop in Jeff Davis County. Massie

was traveling in his Chevrolet Trail Blazer on Loop 166 past the McDonald Observatory when he saw Appellant, who was wearing an orange construction vest, run onto the road and wave him down. Massie stopped and Appellant explained that he and two co-workers had been working on a holding tank at a nearby ranch and their vehicle had broken down. Appellant had been chosen to go for help. Massie unlocked the door and Appellant got in the car. Massie noticed that Appellant smelled bad as though he had been out there for a few days. Massie turned around and headed back to Fort Davis because it was the nearest town. When Massie saw a wrecker and pointed it out, Appellant said he didn't have any money for a wrecker. He also mentioned that he was hungry and wanted to eat first. After some discussion, Appellant said he did not want to stop in Fort Davis but wanted to travel to Alpine. Massie explained that he was not going to Alpine but would be going back to his office in Marfa. Appellant decided that he would go to Marfa because one of his co-workers had an uncle there. During the drive to Marfa, Appellant asked Massie if he had any family and Massie replied that he was married. When Massie asked Appellant if he had a family, he mentioned only having children. Once in Marfa, Appellant and Massie began looking for the house of the co-worker's uncle and Appellant directed him to a road leading out of town. Appellant then pulled out a butcher knife and grabbed Massie's collar while demanding money. Massie gave him his wallet and Appellant instructed him to get out of the car. Massie stopped the car and exited and Appellant followed him. Massie repeatedly told Appellant to not hurt him and to take the car. Despite assuring Massie he would not hurt him, Appellant stabbed him in the neck while holding onto his collar with the other hand. Massie tried to defend himself as Appellant stabbed him numerous times. At one point, Massie was on one knee and Appellant stabbed him in the eye. Massie began fighting back harder and was able to get Appellant on the ground. Massie moved to the opposite side of the car and Appellant got in the car and left, leaving Massie there on the side of the road. Massie walked back

towards Marfa and stopped in front of Fowlkes Cattle Company where he flagged down a passing truck for assistance.

Roy Melvin was driving by Fowlkes Cattle Company when he saw a man trying to flag him down. Melvin and his son got out of their truck and approached the man who was covered in blood. After speaking with the man briefly, Melvin called 911. Deputy sheriffs and an ambulance responded to the scene and Massie was transported to the Big Bend Regional Medical Center in Alpine. Bert LaGarde, one of the paramedics, testified that if Massie had not been provided treatment quickly for his stab wounds, there is a high probability he would not have survived. Dr. George Alsop, a general surgeon, treated Massie upon his arrival at the emergency room. Massie had a total of eleven stab wounds to his head, neck, face, chest, abdomen, and arms. According to Dr. Alsop, the wounds were bleeding extensively when he arrived at the emergency room, and if pressure had not been applied before his arrival it is likely he would have bled to death. Dr. Alsop immediately performed surgery to explore the extent of the internal injuries and to close a wound to Massie's diaphragm. Dr. Alsop tied off the bleeders in the multiple large lacerations and closed all of the wounds. Massie lost about half of his blood volume as a result of the wounds. The following day, Massie was transferred to El Paso because Dr. Alsop was concerned about the wound to the eye and because of an abnormal finding on a CT scan.

Shortly after the Presidio County Sheriff's Office responded to the 911 call, law enforcement authorities in the area were provided with a description of Massie's Trail Blazer and license plate number. Emmit Charles Moore, Jr., a highway patrolman with the Texas Department of Public Safety, spotted the vehicle on July 13, 2006 traveling on the service road of Interstate 20 at milepost 40 and the intersection of Texas Highway 17. Moore initiated a traffic stop and the vehicle pulled over to the side of the road. Moore ordered Appellant to step out, but instead he stuck his head out

of the window and waved, indicating he wanted Moore to walk over to the vehicle. Moore again ordered Appellant to step out, but Appellant put the car in gear and drove off. Moore, joined by other law enforcement officers, began pursuit of Appellant traveling at speeds between 45 and 100 miles per hour on Interstate 20 through several towns. The Department of Public Safety utilized spike strips on six or seven different occasions during the pursuit in an effort to deflate the tires of Appellant's vehicle, but they were not successful until they reached Odessa at milepost 109. At that location, Appellant stopped in a barrow ditch and exited the car, but he kept one hand inside of his pocket to indicate that he had a weapon. He quickly pulled his hand out as though he had a weapon but he had a wallet in his hand which he threw on the ground. Appellant jumped back in the car before he could be taken into custody and took off again. Ranger Jess Malone quickly disabled the tires with a rifle but Appellant did not stop immediately. Malone fired a final shot into the engine; Appellant stopped and was taken into custody.

During the punishment phase, the State also introduced evidence that Appellant had final felony convictions for possession of marihuana, delivery of a controlled substance, and burglary of a habitation. The trial court assessed Appellant's punishment at life imprisonment and ordered him to pay restitution in the amount of $90,000 for Massie's medical bills.

## ADMISSION OF BAD ACT

In Issue One, Appellant contends that the evidence admitted during the punishment hearing was insufficient to establish beyond a reasonable doubt that he murdered his wife in San Antonio five days before he committed the instant offense, and therefore, the trial court erred by considering it in assessing his punishment. The State responds that Appellant failed to preserve error in the admission of this evidence. Alternatively, the State asserts that the evidence is sufficient.

Article 37.07, § 3(a)(1) provides:

Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX.CODE CRIM.PROC.ANN. art. 37.07 § 3(a)(1)(Vernon Supp. 2008).

The State first argues that Appellant did not preserve his complaint. However, whether an extraneous offense or bad act was established beyond a reasonable doubt is a question of fact for the trier of fact, not a preliminary question of admissibility for the trial court. *Vicioso v. State*, 54 S.W.3d 104, 120 (Tex.App.--Waco 2001, pet. ref'd), *citing Mitchell v. State*, 931 S.W.2d 950, 953 (Tex.Crim.App. 1996); *see also Nanez v. State*, 179 S.W.3d 149, 151-52 (Tex.App.--Amarillo 2005, no pet.). Therefore, Appellant's failure to obtain a ruling on his objection to the admission of the evidence does not preclude our review of this issue.

Generally, in reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App. 2000). This standard of review is also applicable to bench trials. *See Diaz v. State*, 902 S.W.2d 149 (Tex.App.--Houston [1st Dist.] 1995, no pet.). Applying the *Jackson v. Virginia* standard to the issue before us, we must determine whether the trier of fact could have found beyond a reasonable doubt that Appellant committed the murder of his wife.

The evidence at admitted at trial established that Appellant was present at Julie's residence shortly before her body was found in the bathroom by police. He told inconsistent stories, first telling Gonzales that his wife was sleeping and later explaining that she wasn't home. Appellant also had an injury on his face just below his eye. Appellant initially prevented Gonzales from entering the home to check on Julie's welfare. When she insisted on going inside, Appellant would not let her look in the bathroom, which is where Julie's body was found moments later. Men's clothing stained with both Appellant's and Julie's blood was recovered from the bedroom. There was a bloody linear marking on the tee shirt consistent with having been made by a broken fingernail. The medical examiner found that Julie had a bloody fingernail and her DNA was extracted from this linear marking. Aware that Gonzales was concerned about Julie's welfare, Appellant fled San Antonio and traveled several hundred miles to the west Texas where he used Julie's credit card on July 10. When law enforcement officers tried to stop him, he led them on a high speed chase for several miles and stopped only when the vehicle was disabled by spike strips and gunfire.

Evidence showing a consciousness of guilt may be one of the strongest indicators of guilt. *Johnson v. State*, 234 S.W.3d 43, 55 (Tex.App.--El Paso 2007, no pet.); *Torres v. State*, 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.). Any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a "consciousness of guilt" may be received as a circumstance tending to prove that he committed the act with which he is charged. *Torres*, 794 S.W.2d at 598. Evidence of flight shows a consciousness of guilt. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex.Crim.App. 1994).

Even excluding from consideration the hearsay statement that Appellant admitted strangling his wife, the evidence admitted at trial, including the consciousness of guilt evidence, is sufficient for a rational trier of fact to find beyond a reasonable doubt that Appellant committed the murder.

We overrule Issue One.

## THE HEARSAY STATEMENT

In Issue Two, Appellant argues that the trial court abused its discretion by permitting Dr. Rulon to testify that she had been told by law enforcement investigators that Appellant had admitted strangling his wife by neck compression. We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex.Crim.App. 2006). This standard requires an appellate court to uphold a trial court's decision to admit evidence decision when that decision is within the zone of reasonable disagreement. *Id*. An appellate court would misapply the appellate abuse of discretion standard of review to reverse a trial court's admissibility decision solely because the appellate court disagreed with it. *Id*.; *see also Robbins v. State*, 88 S.W.3d 256, 259-60 (Tex.Crim.App. 2002).

"Hearsay" is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX.R.EVID. 801(d). Hearsay is not admissible except as provided by statute, the rules of evidence, or a rule promulgated pursuant to statutory authority. TEX.R.EVID. 802. The facts or data upon which an expert bases an opinion or inference need not be admissible in evidence if they are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject. TEX.R.EVID. 703. Thus, an expert's opinion may be based on hearsay if the hearsay is the type of information reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject. *See Richardson v. State*, 83 S.W.3d 332, 351 (Tex.App.--Corpus Christi 2002, pet. ref'd). An expert witness may disclose on direct examination or be required to disclose on cross-examination the underlying facts or data supporting his expert opinion or inference. TEX.R.EVID. 705(a). When the underlying facts or data are inadmissible, the trial court shall exclude the underlying facts or data if

the danger that they will be used for a purpose other than an explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial. TEX.R.EVID. 705(d).

On direct examination, Dr. Rulon expressed her expert opinion that the cause of death was asphyxiation by strangulation. Appellant challenged the basis for that opinion and established that if Dr. Rulon disregarded all information except for the autopsy findings, her opinion on the cause of death would be different in that she would state that the cause of death was undetermined. Dr. Rulon added that asphyxiation would be included in her differential. On re-direct, Dr. Rulon explained that in forming an opinion on the cause of death and manner of death, forensic pathologists incorporate the findings at autopsy, all other ancillary studies, such as toxicology and microscopic findings, and the facts provided by law enforcement officers who are investigating the case. In this particular case, her opinion as to the cause of death was based, in part, on a statement by a law enforcement officer that Appellant had confessed to strangling his wife by compressing her neck. Dr. Rulon's testimony about Appellant's statement is therefore admissible pursuant to Rule 703(a). *See Austin v. State*, 222 S.W.3d 801, 812 (Tex.App.--Houston [14th Dist.] 2007, pet. ref'd)(summary of interview of defendant's husband's father during psychological evaluation of defendant was admissible under hearsay exception to show basis of expert opinion; licensed psychologist testified that background information, such as interviews with defendant's family members, was important in his assessment of defendant and whether she had Munchausen Syndrome by Proxy, most of the hearsay statements, particularly regarding defendant's lying, drawing attention to herself, and intentionally making her child sick, directly supported psychologist's opinions, and disclosing this information assisted jury in evaluating weight to give psychologist's opinions). The trial could did not abuse its discretion by overruling Appellant's hearsay objection. Further, Appellant did not

object under Rule 705(d).  We overrule Issue Two and affirm the judgment of the trial court.


May 20, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

(Do Not Publish)