IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-07-00327-CR

 

Brinjit Velu,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 

 



From the 272nd District
Court

Brazos County, Texas

Trial Court No. 06-00706-CRF-272

 



MEMORANDUM  Opinion



 








A jury convicted Brinjit Velu of forgery
and the trial court assessed his punishment at 180 days’ confinement in a state
jail, suspended for two years.  Velu challenges: (1) the legal and factual
sufficiency of the evidence to support his conviction; (2) the admission of
extraneous offense evidence; (3) the admission of a business records affidavit;
and (4) the inclusion of an allegedly erroneous application paragraph in the
jury charge.  We affirm.

 

FACTUAL BACKGROUND

            Velu, an Indian national and
master’s student, met Lizzy Kelly on an internet dating website.  Kelly claimed
to be a Pennsylvania resident studying in Nigeria.  Velu became interested in
Kelly.  At some point, Velu agreed to cash a check for Kelly and wire her the
money.  Velu received the cashier’s check from Kelly’s aunt.  In India, cashier’s checks are the “most secure financial instruments,” so Velu did not
suspect that the check might be counterfeit.  He took the check to Bank of
America, where he maintained an account.  The bank accepted the check, but
later returned the check with a letter advising Velu that the check was
counterfeit.  The bank closed Velu’s account.

Kelly told Velu that her aunt had
stopped payment on the check.  Velu believed Kelly and agreed to cash a second
check from Kelly’s aunt.  Kelly instructed Velu to take the check to a
check-cashing point and send her the money.  Velu took the check to Mr. Payroll,
believing that Mr. Payroll was in a better position to verify the check’s
authenticity and tell him whether the check was “genuine or fake.”    

Dorothy Johnson received the check from
Velu.  Johnson noticed that the check contained handwriting instead of machine
printing and omitted the payor’s telephone number.  Velu told Johnson that he
was cashing the check for a friend and needed to wire the money.  Johnson,
aware of a Nigerian check-cashing scam, became suspicious.  Upon further
questioning, Velu motioned for Johnson to “quiet down.”  He then told Johnson
that an aunt had asked him to cash the check and wire the money to her niece in
 Nigeria.  After contacting the bank, Johnson discovered that the check was
counterfeit and contacted police.

            Officers Tom Jagielski and
Kevin Roby spoke with Velu at Mr. Payroll.  Velu told both officers that he had
received the check from a friend in Florida and that this was the second of two
checks he had received from this friend.  He deposited the first check into his
bank account, but subsequently learned that the check was counterfeit.  The
bank returned the check, closed his account, and returned the remaining funds
to him.  Velu further told Roby that he received a letter with the second check
instructing him to cash the check at a “check-cashing place[]” instead of
depositing the check into his own bank account.  He told Roby that he planned
to send the money to a friend in Nigeria.  Velu also told Roby that he thought
the money might be stolen.  Velu told Jagielski that he did not deposit the
second check into his account because he thought the check was probably bad since
it was written on the same bank by the same person as the first check.  He did
not want his new account to be closed. 

            Velu told investigator
Thomas Reitmeyer that he received the check from his friend, went to Mr.
Payroll to cash the check, and planned to wire the money to a friend in Nigeria.  He mentioned Kelly, explaining that she had initially asked him for money, but he
had no money to give.  Kelly then told Velu that her mother’s friend would send
him a check and instructed Velu to deposit the check and wire her the money. 
Velu said that the first check was post-marked Ireland and written on a bank in
 Florida.  He told Reitmeyer that he later learned that the check was
counterfeit.  Kelly told him that her friend’s mother had stopped payment on
the check and would send another check.  

At a second interview, Velu offered to
log into his email account and show Reitmeyer the emails from Kelly.  Velu
refused to consent to a forensic search of his computer.  After obtaining a
search warrant, Reitmeyer recovered Velu’s computer, a letter from Velu’s bank
advising him about the counterfeit check and the closure of his account,
Western Union receipts, the first counterfeit check, and a bank statement.

            Detective Paul Price
conducted the forensic search of Velu’s computer.  Price found an email and a
chat log involving Kelly.  The email contained wiring instructions.  In the
chat log, Kelly told Velu that the first check was not cancelled.  She asked
Velu to cash the check at a check-cashing point, deduct $250 for himself, the Western Unio n charges, and the check-cashing fee, and send her the remaining funds.  Velu
agreed.  Price found evidence that Velu had been visiting several different
dating websites.  Price found no evidence that Velu was trying to hide
something.

After his release from jail, Velu told
Kelly that her aunt sent a counterfeit check and that the police were going to
come after her.  Kelly logged off the computer.  Velu later discovered that
Kelly had several internet profiles, using the same photograph, in different
locations across the United States.

LEGAL AND FACTUAL SUFFICIENCY

            In his first point, Velu
contends that the evidence is legally and factually insufficient to show that
he acted with the intent to defraud or harm another or knew that the check was
forged.

Standards of Review

Under legal sufficiency review, we determine
whether, after viewing all the evidence in the light most favorable to the
verdict, any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.  Curry
v. State, 30
S.W.3d 394, 406 (Tex. Crim. App. 2000) (citing Jackson
v. Virginia, 443
U.S. 307, 318-19, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). 
We do not resolve any conflict of fact or assign credibility to the witnesses,
as this was the function of the trier of fact.  See Dewberry
v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999); see also Adelman
v. State, 828
S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson
v. State, 819
S.W.2d 839, 843 (Tex. Crim. App. 1991).  Inconsistencies in the
evidence are resolved in favor of the verdict.  Curry, 30 S.W.3d at 406; Matson, 819 S.W.2d at 843.

Under factual sufficiency review, we ask
whether a neutral review of all the evidence demonstrates that the proof of
guilt is so weak or that conflicting evidence is so strong as to render
the jury’s verdict clearly wrong and manifestly unjust.  Watson v. State, 204 S.W.3d 404, 414-15 (Tex.
Crim. App. 2006); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).  We review the evidence weighed by the jury that tends
to prove the existence of the elemental fact in dispute and compare it with the
evidence that tends to disprove that fact.  Johnson, 23 S.W.3d at 7.  We
do not indulge in inferences or confine our view to evidence favoring one
side.  Rather, we look at all the evidence on both sides and then make a
predominantly intuitive judgment.  Id.

Analysis

In order to prove the offense of forgery
by passing, the State must show that the defendant: (1) with intent to defraud
or harm another (2) passed (3) a writing (4) that purported to be the act of
another and (5) that other persons did not authorize the act.  See Tex. Pen. Code
Ann. § 32.21(a), (b) (Vernon Supp. 2008); Williams v. State, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985).  Intent
to defraud or harm requires
proof of knowledge that the instrument is forged.  See Williams, 688 S.W.2d at 488.  Intent may be established by
circumstantial evidence.  Id.  Intent
may be inferred if the State establishes that the defendant knew the instrument
was forged.  See Beaty v. State, 156 S.W.3d 905, 909 (Tex. App.—Beaumont 2005, no pet.).

The State relied on several facts to
establish Velu’s intent and knowledge.  Velu contends that none of these facts support
his conviction because each fact is ambiguous.

First, the State relied on the
extraneous counterfeit check.  Velu contends that the two checks are
dissimilar: the first check was handwritten, the second check was typed, each
check had a different payor, and each check was written on a different account
and different bank.  However, both checks involve similar transactions.  The
two checks were from the same source, Kelly was the intended recipient of the
funds from both checks, both checks were for $3,000, and Velu planned to wire
the funds from both checks.  In fact, Reitmeyer opined that, because the bank
advised Velu that the first check was counterfeit, a “reasonable person would
believe that he had prior knowledge that there was something wrong and that
that check, in all likelihood, was false and should not be attempted to be
cashed.”  He added that if a person with that knowledge still attempts to cash
the check, then it becomes “kind of a ‘Well, let’s see what happens’ type of
situation.”  The first counterfeit check is evidence of intent and knowledge.  See
Laws v. State, No.
14-00-01093-CR, 2001 Tex. App. LEXIS 7576, at *15  (Tex. App.—Houston [14th Dist.] Nov. 8, 2001, no
pet.) (not designated for publication) (despite defendant’s claim that he did
not know a check was forged, he had engaged in a similar scheme before
committing the charged offense).

Second, the State relied on Velu’s
conflicting stories: he was cashing the check for a friend, he was cashing the
check for an aunt to send to her niece in Nigeria, he received the money from a
friend in Florida, and he received the check from Kelly’s mother’s friend in Ireland.  Velu contends that “[g]iven a liberal interpretation of [his] explanations about
how he received the check, his stories were consistent with one another.”  Yet,
the jury was entitled to consider any conflicts in Velu’s story as evidence of
guilt and bore the burden of resolving such conflicts either for or against him. 
See Kemmerer v.
State, 113 S.W.3d 513,
516 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d) (“jury could have viewed appellant’s
changing versions of the incident as evidence of guilt.”); see also Lancon v. State, 253 S.W.3d 699, 707 (Tex. Crim.
App. 2008) (the
jury “may choose to believe some testimony and disbelieve other testimony”); Wyatt v. State, 23 S.W.3d 18, 30 (Tex. Crim. App.
2000) (it is within the exclusive province of the jury to reconcile conflicts
in the evidence).

Third, Velu motioned for Johnson to be
quiet when she questioned him about the check.  Velu contends that the meaning
behind his gestures is “inconclusive and speculative.”  He testified that he was
attempting to clarify things with Johnson, not silence her.  Johnson found Velu’s
behavior unusual.  Because intent and knowledge may be inferred from the
defendant’s acts, words,
and conduct at the time of the offense, the jury was entitled to consider
Velu’s gestures towards Johnson.  See Hart v. State,
89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Fourth, the State challenged Velu’s failure
to produce “love letters” evidencing a relationship with Kelly.  Velu argues
that the lack of such letters does not establish the absence of an “important
relationship.”  Velu testified that he cared about Kelly, was interested in
Kelly, and anticipated entering a “committed relationship” with Kelly.  He also
testified that Kelly sent him photographs and wanted to meet him.  Even without
written evidence of a relationship, the jury could have found that such a relationship
did exist.  As the sole judge of the
weight and credibility of the evidence, the
jury bore the burden of deciding what to believe.  See Lancon, 253 S.W.3d at 707; see
also Wyatt, 23 S.W.3d at 30.

Fifth, the State argued that Velu benefited
from the transaction.  In the chat log, Kelly instructed Velu to retain $250
for himself, but Velu testified that he did not benefit financially from the
transactions.  However, it was not necessary that Velu reap a benefit.  See Landry
v. State, 583 S.W.2d
620, 623 (Tex. Crim. App. 1979)
(“‘[P]ass’ in the forgery
statute means to offer the forged instrument, and it does not require a showing
that the defendant actually received consideration in exchange for the
check.”); see also McGee
v. State, 681 S.W.2d 31 (Tex. Crim. App. 1984) (same); Lee v. State,
No. 06-07-00137-CR, 2008 Tex. App. LEXIS 1048, at *3-4
(Tex. App.—Texarkana Feb. 14, 2008, no pet.) (not designated for
publication) (same).

Finally, the State emphasized Velu’s
statements to police that he thought the check might be bad and the money might
be stolen.  Velu contends that he did not know, but merely suspected, that the
check was counterfeit.  He denied telling the officers that the second check was
written on the same account by the same person.  He did not want to risk the
closing of his bank account and believed that Mr. Payroll would tell him
whether the check was counterfeit.  He maintains that he was merely a “victim of
a check-cashing scam in which good natured and honest people were deceived by
online swindlers into cashing counterfeit checks and sending the money
abroad.”  According to Velu, his statements indicate nothing more than criminal
negligence.  We disagree.

Velu’s statements are evidence of guilt,
suggesting an awareness of the check’s fraudulent nature.  See Laws, 2001 Tex. App. LEXIS 7576, at *13 (defendant
admitted taking the check to the bank to verify its validity).  Velu had already attempted to cash a
forged check from the same source and he knew that this first check was
forged.  As Reitmeyer testified, this fact is sufficient to cause a reasonable
person to conclude that the second check was also fraudulent and should not be
cashed.  See id.
at *15 (circumstances suggested that genuineness of check should have been
questioned).  Bank of
America knew about the previous forged check and had already closed one of
Velu’s accounts.  The jury could reasonably conclude that Velu, an intelligent
man and a masters student in petroleum engineering, was not the victim of an
internet scam, but knew that this second check was also fraudulent and chose to
cash the check at Mr. Payroll where he perceived a lesser risk of being caught. 
His unusual behavior towards Johnson and conflicting stories support such a
conclusion.  See Hart, 89 S.W.3d at 64; see also Kemmerer, 113 S.W.3d at 516; Laws, 2001
Tex. App. LEXIS 7576 , at *12 (knowledge can be established by
“suspicious circumstances”, including nervous and unusual behavior).  Additionally,
the check bore visible signs of fraud, such as the handwriting and lack of
contact information for the payor.  Knowing
the check to be fraudulent, but making the conscious decision to attempt to
cash it, evidences intent to defraud or harm another.  See Beaty, 156 S.W.3d at 909.

Viewing
all the evidence in the light most favorable to the verdict, the jury
could reasonably conclude, beyond a reasonable doubt, that Velu committed the
offense of forgery.  See Curry, 30 S.W.3d at 406.  The
proof of guilt is not so weak nor the conflicting evidence so strong as to
render the jury’s verdict clearly wrong or manifestly unjust.  See Watson, 204 S.W.3d at 414-15; see
also Johnson, 23 S.W.3d at 11.  Because
the evidence is legally and factually sufficient to sustain Velu’s conviction,
we overrule his first point of error.

Extraneous
Offense Evidence

In his second point, Velu challenges the
admission of (1) evidence regarding the first counterfeit check; and (2)
Western Union transfer receipts.  We
review a trial court’s admission of extraneous offense evidence for abuse of discretion. 
See Page v. State, 213 S.W.3d 332, 337 (Tex. Crim. App.
2006).

The Challenged Evidence

Outside the jury’s presence, the State
sought to offer the first counterfeit check that Velu cashed at Bank of
America, arguing that the evidence establishes intent and knowledge.  For these
same reasons, the State sought to admit evidence of several wire transfers that
Velu sent to individuals in the United Kingdom in the seven months preceding
the offense.  Velu objected that the evidence is “prejudicial and outweighs the
probative value.”  See Tex. R. Evid.
403.  The trial court overruled the
objection. 

 

Extraneous Counterfeit Check

Although Velu had previously objected to
admission of the extraneous check, when the State offered the check into
evidence, Velu had “[n]o objection.”  Under these circumstances, he has failed
to preserve any complaint regarding admission of the check.  See Swain v. State, 181 S.W.3d 359, 368 (Tex. Crim. App.
2005)
(“The affirmative
acceptance of [] previously challenged evidence waived any error in its
admission.”); see also
Grisso v. State, 264 S.W.3d 351, 354 (Tex. App.—Waco 2008, no pet.) (Where “defense counsel affirmatively represents that the
defendant has ‘no objection’
to the evidence, any error in the admission of the evidence is waived even if
the error had been previously preserved by a suppression motion and adverse
ruling.”).

Western Union Transfer Receipts

In addition to his Rule 403 objection
outside the jury’s presence, when the State offered the receipts into evidence,
Velu objected on the basis of “relevance.”  See Tex. R. Evid. 401.  The trial court overruled the objection.

Relevant evidence has “any tendency to
make the existence of any fact that is of consequence to the determination of
the action more probable or less probable than it would be without the
evidence.”  Tex. R. Evid. 401. 
Extraneous offense evidence may be admissible to show motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or
accident.  Tex. R. Evid. 404(b). 
This list is “neither mutually exclusive nor collectively exhaustive.”  Prible v. State,
175 S.W.3d 724, 731 (Tex. Crim. App. 2005).  Extraneous offense evidence is admissible where (1) it is
relevant to a fact of consequence in the case apart from its tendency to prove
conduct in conformity with character; and (2) the probative value of the
evidence is sufficiently strong so that it is not substantially outweighed by
unfair prejudice.  Johnston v. State, 145 S.W.3d 215, 220 (Tex. Crim. App.
2004); see Tex. R. Evid. 403 (Relevant evidence
may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice).


Velu contends that this evidence was
admitted to tie him to a Nigerian check-cashing scam that the State never established
or explained.  The State argues that the receipts are relevant to intent and
knowledge because they show that: (1) Velu’s “intention in the instant case --
to wire the money internationally to individuals he had never met -- was not an
isolated occurrence;” and (2) Velu “regularly wired large sums of money to
individuals in foreign countries,” specifically those “in the same area from
which the fraudulent checks originated.”[1] 
The State relies on Parks
v. State, 746 S.W.2d
738 (Tex. Crim. App. 1987)
and Beasley v. State, No.
01-02-00942-CR, 2004 Tex.
App. LEXIS 6058 (Tex. App.—Houston [1st Dist.] July 8, 2004, pet. ref’d) (not designated for
publication), to support its position.

In Parks, the defendant was
convicted of forging a release of lien.  See Parks, 746 S.W.2d at 738-39.  The State introduced
evidence of two earlier forged releases.  Id.  The Court of Criminal
Appeals noted, “Establishing intent in [forgery] cases is so crucial and so
difficult to do that, as a practical matter, evidence of extraneous offenses is
nearly always admissible.”  Id. at 740.  The forged releases were
relevant because they: (1) were “very nearly identical” to the charged offense;
and (2) “showed that it was more likely than not that [Parks] had formed an
intent to commit the offense pursuant to a general plan to enrich himself.”  Id. at 741.

In Beasley, the defendant opened
an account with Union Planters Bank, deposited several counterfeit checks, and
withdrew the funds.  See Beasley, 2004 Tex. App. LEXIS 6058, at *1-2. 
He was convicted of felony
aggregate theft.  Id. at *1.  The State introduced evidence that Beasley
had used this scheme at another bank.  Id. at *18.  Beasley argued that
he “innocently received the counterfeit checks” and deposited them at his bank.
 Id. at *19.  The First Court found the extraneous offense evidence
relevant “because it makes the innocent deposit of checks at Planter’s bank
less likely.”  Id. at *19-21.

Unlike Parks and Beasley,
the extraneous offense evidence in this case is not virtually identical to the
charged offense.  Although the extraneous offense and the charged offense both
involve wire transfers of money to individuals overseas, there is no evidence
that the extraneous transfers involve funds obtained from a forged check.  The
only evidence regarding the source of these funds came from Velu, who testified
that he obtained the money from legitimate sources, i.e., his parents or
his employment with the engineering department at his university.  The State
offered no evidence suggesting the funds for these transfers came from an
illegal source.  See Feldman
v. State, 71 S.W.3d
738, 754 (Tex. Crim. App. 2002) (the
proponent of extraneous offense evidence must show that the evidence has
relevance apart from character conformity).  Thus, the extraneous transfer
receipts were not relevant to Velu’s intent to defraud or harm another or his knowledge
that the check was forged.  The trial court abused its discretion by admitting
this extraneous offense evidence.

We must now determine whether this error
affected Velu’s substantial rights, i.e., whether the “the error had a
substantial and injurious effect or influence in determining the jury’s
verdict.”  Haley v. State, 173 S.W.3d 510, 518 (Tex. Crim.
App. 2005); see Tex. R.
App. P. 44.2(b). 
We “consider everything in the record, including any testimony or physical
evidence admitted for the jury’s consideration, the nature of the evidence
supporting the verdict, the character of the alleged error and how it might be
considered in connection with other evidence in the case.”  Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim.
App. 2002).  We may also consider the jury instructions, the State’s
theory of the case, any defensive theories, closing arguments, voir dire, and
the extent to which the State emphasized the erroneously admitted evidence.  See
id. at 355-56.  “[S]ubstantial
rights are not affected by the erroneous admission of evidence ‘if the
appellate court, after examining the record as a whole, has fair assurance that
the error did not influence the jury, or had but a slight effect.’”  Id. at 355.

Velu testified that, in the seven months
before the offense, he was contacted as a winner of the online lottery in the United Kingdom.  During that period, he sent several wire transfers to lottery personnel.  Velu
testified that these transfers represent fees that he was told to pay in order
to recover his winnings.  Reitmeyer found the receipts suspicious because Velu
had mentioned that the counterfeit check came from an individual in Ireland or the United Kingdom.  Although he opined that the transfers indicated “prior activity” or
“prior knowledge,” Reitmeyer found nothing illegal associated with the
receipts.  Price found emails to individuals in the United Kingdom, but found
no evidence that they were related to the forgery case.

Price did find evidence that Velu was
experiencing financial difficulties, which he found contradictory in light of
the transfers.  Specifically, Price located only one bank account that never
contained more than $200 in the five month period before the offense.  He also
found numerous email solicitations for credit cards and loans in excess of the
average college student.  Velu, however, testified that he maintained other
bank accounts in addition to the one identified by Price.  Velu used the
account Price referred to for contacting his family in India; thus, he kept only a small amount of money in the account.  Velu testified that he used money
from his parents and his employment to transfer the funds to the United Kingdom.

During closing argument, the State
questioned why Velu did not have $250 to send to Kelly when he had been sending
$8,000 in wire transfers to the United Kingdom.  The State expected the defense
to argue that Velu was naïve:

If that’s the case, his suspicions
should have been raised to the point in December of 2005, when he’s getting
counterfeit checks.  He’s supposedly sent money over to the Lucky Lottery
business, but he’s not getting any money back? He’s wiring $8,000 of money and
not getting any back, but he’s getting checks in the mail from a girl that
doesn’t write him any letters? That doesn’t make any sense, people.  It’s
because he’s guilty.  He’s -- he knew what was going on.  His intent is clear
after you get the first check, and we ask that you find him guilty.  

 

The defense argued that it is not
illegal to wire money, the wire transfers did not connect Velu to any criminal
activity, and the receipts were merely admitted to show that Velu had knowledge
that the check was forged.  The defense added that Velu thought he had won the
lottery, but was tricked into believing that he had to pay money in order to
receive his winnings.  In rebuttal, the State argued that Velu “had been had a
few times,” which should have alerted him to “watch out,” but he became a
“willing participant.”  The State argued that this was not “the first check
with no other history of [Velu] having any financial obligations, sending
money, things to cue him in that ‘This is wrong, I know this is wrong.”

As the defense noted in closing, the
wire transfers are not evidence of any illegal activity.  The record contains
no evidence suggesting that the money Velu wired to the United Kingdom was obtained illegally or, more specifically, came from a forged check.  Rather, Velu
identified legitimate sources of the funds and Reitmeyer found no evidence that
the transfers were linked to criminal activity.  Neither does the record
connect the wire transfers to the forgery case in any way.  The transfers
indicate nothing more than the fact that Velu was duped into believing he had
won the online lottery.

Moreover, we have already found the
evidence legally and factually sufficient to sustain Velu’s conviction.  It is
unlikely that evidence of the wire transfers, which were unrelated to either
criminal activity or the present forgery case, had a substantial or injurious
effect or influence on the jury’s verdict.  See Haley, 173 S.W.3d at 518.  The
erroneous admission of the evidence is harmless.  We overrule Velu’s second
point.

Business
Records Affidavit

In his third point, Velu challenges the
admission of a business records affidavit from the custodian of records of First
Coast Community Credit Union.  We review admission of this evidence for
abuse of discretion.  See Jones
v. State, 944
S.W.2d 642, 651 (Tex. Crim. App. 1996).

Two letters from First Coast’s member service manager and a copy of the counterfeit check were attached to the business
records affidavit.  According to the first letter, GP Community Federal Credit
Union became First Coast in May 2003.  Since that time, all cashier’s checks
bear the First Coast name, are not hand-written, include the President/CEO’s
facsimile signature, and contain a certain number sequence.  The counterfeit
check was written after the name change, but bore the GP name.  The manager
states, “[T]his is not our check, we did not issue this check and will not
honor.”  The letter erroneously states that the $3,000 check was for $5,000. 
In the second letter, the manager states: “We have no record of this check
number, we do not issue hand written checks and our checks have a facsimile
signature.”

Outside the jury’s presence, Velu objected
to admission of the affidavit: (1) “It’s not made at or near the time of the
occurrence; and also, it’s swearing to a check that’s a 5,000-dollar check and
the check in this case is a $3,000-dollar check”; (2) “[I]t’s prejudicial and
irrelevant”; and (3) “[S]he’s not subject to cross-examination.  It’s a sworn declaration
that she looked at the check, and it’s -- I can’t cross-examine her.  I think
it’s prejudicial against my client.  It’s misleading to the jury.”  The trial
court overruled the objections, noting that the affidavit had been on file for
more than fourteen days.  See Tex.
R. Evid. 902(10).

On appeal, Velu contends that admission
of the affidavit violates the Confrontation Clause because he was unable to
cross-examine the affiant regarding the discrepancy in the amount of the
check.  The State contends that Velu failed to preserve this complaint for
appeal.  We agree.

Velu briefly mentioned cross-examination
in conjunction with his objection that the evidence is prejudicial and
misleading.  Appellate courts have found similar statements insufficient to
preserve a Confrontation Clause complaint.  See Austin v. State,
222 S.W.3d 801, 811 (Tex. App.—Houston [14th Dist.] 2007, pet. ref’d), cert. denied,    
U.S.    , 128 S.Ct. 1230, 170 L.Ed.2d 79 (2008) (defendant’s “reference to the inability to
cross-examine the declarant” was mentioned “only in the context of making a
hearsay objection.”); see
also Rivera v. State, No. 05-06-00678-CR, 2007 Tex. App. LEXIS 6508, at
*15 (Tex. App.—Dallas Aug. 10, 2007, pet. ref’d) (not designated for
publication) (statement
that the defendant had a “right to confront his accusers” was made in the
context of a hearsay objection); Taylor v. State, No.
06-05-00033-CR, 2006 Tex.
App. LEXIS 327, at *3, 6 (Tex. App.—Texarkana Jan. 13, 2006, no pet.) (not
designated for publication) (statement, made amidst a hearsay objection, that
the State could “bring[] in
the person so that we have the right to confront them and to cross-examine
them”
was a “hybrid argument” under both federal and
state rules).

In Austin, the Fourteenth Court
stated, “Even if such a
minor reference to cross-examination could be construed to include a Confrontation Clause
objection, ‘[w]hen a defendant’s objection encompasses
complaints under both the Texas Rules of Evidence and the Confrontation Clause,
the objection is not sufficiently specific to preserve error.’”  Austin, 222 S.W.3d at 811 (quoting
Reyna v. State, 168 S.W.3d 173, 179 (Tex. Crim. App.
2005)).  Velu’s objection could be construed as one
based on either the Confrontation Clause or the Rules of Evidence.  Accordingly, his third point is not
preserved for appellate review.[2]
  

JURY CHARGE

In his fourth point,
Velu contends that the application paragraph in the jury charge was erroneous.

The indictment alleged that Velu “with
intent to defraud or harm another, transfer[ed] or pass[ed] to Dorothy Johnson
a forged writing, knowing such writing to be forged, and such writing had been
so altered, made or completed that it purported to be the act of GP Community
Federal Credit Union, who did not authorize the act, and said writing was a
check…”  The application paragraph states:

Now if you find from the evidence beyond
a reasonable doubt that on or about December 19, 2005 in Brazos County, Texas,
the defendant, BRINJIT VELU, did, with the intent to defraud or harm another,
transfer or pass a writing to Dorothy Johnson so it purported to be the act of
GP Community Federal Credit Union, who did not authorize the act, and said
writing was a check of the tenor set forth in the indictment, then you will
find the defendant guilty.

 

Velu contends that the application
paragraph erroneously omitted the “knowledge element” included in the
indictment.

When reviewing a jury
charge, we first examine the charge for error.  See Ngo v.
State, 175
S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing Middleton
v. State, 125
S.W.3d 450, 453 (Tex. Crim. App. 2003)).  A jury charge must include all essential
elements of the offense.  See Martin
v. State, 200 S.W.3d
635, 639 (Tex. Crim. App. 2006).

Knowledge is not a statutory element of
the forgery offense.  See Tex. Pen. Code Ann. § 32.21(a), (b).  Intent to defraud or harm is the
culpable mental state and is established by proof of knowledge.  See
Williams, 688 S.W.2d at 488.  Thus, the trial court’s application paragraph
alleges all the essential elements of the forgery offense. 
See Martin, 200 S.W.3d at 639; see also Williams, 688
S.W.2d at 488.  In particular, it alleges the requisite culpable mental state, i.e.,
intent to defraud or harm.  See Williams, 688 S.W.2d at 488; see also Tex. Pen. Code
Ann. § 32.21(b); Jones
v. State, 571 S.W.2d 191, 192-93 (Tex. Crim. App. 1978) (“An indictment
that ‘allege[s] that the
act was committed ‘with intent to defraud or harm another,’ which is the
essential mental element,’” but does not allege knowledge, is not fundamentally
defective.).  Accordingly,
the charge is not erroneous.  We overrule Velu’s fourth point.

The judgment is affirmed.

 

FELIPE REYNA

Justice

Before Chief
Justice Gray,

Justice
Reyna, and

Justice
Davis

Affirmed

Opinion
delivered and filed February 25, 2009

Do not publish

[CR25]









[1]               The jury charge limited the jury’s
consideration of the evidence to intent and knowledge.

 





[2]               Even had Velu’s objection
been preserved, the error, if any, was harmless because the same or similar
testimony was introduced elsewhere without objection.  See Lasher v. State, 202 S.W.3d 292, 295 n.1 (Tex.
App.—Waco 2006, pet. ref’d);
see also Broussard
v. State, 163 S.W.3d
312, 318 (Tex. App.—Beaumont 2005, no pet.).  Before admission of the affidavit,
Johnson testified that cashier’s checks are “usually typed all the way, except
for the signature,” not hand-written as the check she received from Velu.  She
testified that all the valid cashier’s checks that she had observed were machine
printed.  She also testified that, unlike most cashier’s checks, Velu’s check
did not list a telephone number for the bank.  Johnson contacted the bank,
which confirmed that the check was fraudulent.  Velu later admitted that the
check is “fake, counterfeit” having “already been confirmed at Mr. Payroll.” 
He agreed that the bank denied authorizing the check.  The record contained
other evidence, besides the complained-of evidence, showing that the check was
forged.