In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-24-00252-CR**

**EDWIN THOMAS BATY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 253rd District Court**
**Liberty County, Texas**
**Trial Cause No. 22DC-CR-00562**
_____

**MEMORANDUM OPINION**

Edwin Thomas Baty was indicted for capital murder by terroristic threat or other felony. Tex. Penal Code Ann. § 19.03(a)(2). The indictment alleged that Baty "did then and there intentionally cause the death of an individual, namely Christopher Aaron Jorgensen, by shooting Christopher Aaron Jorgensen with a firearm, and the defendant was in the course of committing or attempting to commit the offense of obstruction or retaliation against Christopher Aaron Jorgensen, and

1

the defendant did then and there use or exhibit a deadly weapon, to wit: a firearm, during the commission of said offense[.]" The State's theory at trial was that Baty intentionally killed Jorgensen because Baty sexually abused Jorgensen, and Jorgensen threatened to go to the police about the abuse. Because Baty was a convicted child sex offender, another conviction would send Baty to prison for life; he did not want this to happen, so—according to the State—he killed Jorgensen to prevent Jorgensen from going to the police and sending him back to prison. Baty, on the other hand, argued a case of self-defense. According to Baty, on the night of the incident, Jorgensen acted aggressively towards Baty and another man named Alvin Zachary, threw lawn equipment off the bed of a truck, beat up Zachary, and followed Baty into his residence where Baty shot him in self-defense. The jury found Baty guilty of the offense and sentenced him to life in prison without the possibility of parole. However, the judgment of the trial court sentenced Baty to the Texas Department of Criminal Justice for a term of life with the possibility of parole.

On appeal, Baty complains he received ineffective assistance of counsel because his trial counsel failed to object in three general areas: he failed to object to four extraneous offenses, he failed to object when Baty invoked his right to counsel during a recorded interview that was played for the jury, and he failed to object to three areas of the jury charge. He also complains that the judgment contains an illegal

sentence. For the reasons discussed below, we affirm the trial court's judgment as modified herein.

## Background

Several witnesses testified at trial. We discuss the testimony from the witnesses whose testimony is relevant to the issues on appeal.

*Luis Jennings*

Luis Jennings is a patrol officer with the Liberty County Sheriff's Office who responded to a shooting on May 1, 2022. When he arrived, two people were present on the property: Zachary, who had blood on his face, and Baty. Jennings testified that Baty told him he called 911 and that there was a gun in the house. Jennings observed Zachary with a laceration at the top of his nose, one on the bridge of his nose, and another on his chin. Jennings could not specifically remember if he observed lawn tools and equipment scattered on the ground but did testify that "[t]here was stuff on the ground."

Jennings also explained the "21-foot rule," which "is a reactionary gap regarding the advancement of a person trying to commit a deadly act to another person, and that person has basically about a second-and-a-half to react to that 21-foot rule. You can use deadly force within that 21-foot rule." The prosecutor posed a scenario to Jennings where someone is standing in a room with a shotgun behind a door and their attacker is within ten feet and begins to charge. The prosecutor asked

3

if it was probable that a person would have time to retrieve the weapon, level it, and fire it before the attacker either pushed the weapon away or was on top of that person. In Jennings's opinion, "it would be more than one-and-a-half seconds to react to grabbing the weapon, leveling the weapon to defend yourself, and then firing the weapon at the -- at your threat." He believed that the threat would be upon such a person before the person could fire.

On cross-examination, Jennings testified that about seventy percent of Zachary's face was covered in blood, which was a sign that someone had been beaten up. He also observed Zachary, who he said was "very shaken and very distraught." He opined that Baty seemed "a little distraught, a little apologetic about what had happened." He agreed that Zachary and Baty seemed like they got out of a pretty stressful situation. He also agreed that stress can cause people to perceive minor details incorrectly.

*Steven Thomas Rasberry*

Rasberry is an investigator with the Liberty County Sheriff's Office who responded to the shooting. Rasberry was responsible for interviewing witnesses that were on the scene. He also conducted two recorded interviews with Baty. Rasberry testified that Baty told him in the first recorded interview that he returned home that evening and Jorgensen assaulted Zachary. Zachary retreated into the main residence at this address. Baty also went into the residence. Jorgensen followed Zachary into

4

the residence, acting aggressively. Jorgensen charged Baty in an aggressive manner and Baty used a shotgun in his possession to defend himself. At the time Baty gave Rasberry his first statement, Rasberry did not have enough information to decide whether Baty acted in self-defense.

Rasberry recalled that when he responded to the scene of the crime, he saw Jorgensen lying on the ground just outside the front door of the residence with "traumatic injury wounds from a firearm that matched the description that the defendant gave" him, a shotgun. During his investigation, he determined that there were five people on the scene of the crime but when he arrived, there were only two: Baty and the deceased. He later learned that a man named Daniel Luken had been present that night, and Rasberry interviewed him several days later. During Rasberry's first interview with Baty, Baty stated that he did not know whether Luken was present the night of the shooting. Rasberry later learned that Luken had also fired a shotgun.

Baty told Rasberry that he fired his shotgun at Jorgensen three times. Baty also told Rasberry that Jorgensen was aggressively approaching him while he was at the threshold of Baty's bedroom door. Baty stated that Jorgensen was trying to get into his bedroom by way of the door. Baty told Jorgensen to go away. Baty opened the door and Jorgensen charged Baty, and that is when Baty fired. Rasberry did not understand from speaking with Baty whether Jorgensen was right in front of Baty or

several feet away. Rasberry testified that no witnesses told him that Jorgensen had a weapon. Nor did Rasberry see Jorgensen with a weapon.

The prosecutor played Baty's first recorded interview with Rasberry. Rasberry read Baty his *Miranda* rights. Near the end of the interview, Baty states that he is out on bond for a DWI and that he was charged with aggravated sexual assault of a child for which he served five years in prison. The reporter's record indicates that the file was played but the recording was not transcribed by the reporter.

Rasberry reviewed several photos taken of the crime scene. Rasberry noted several things when looking at the photos: blood spots inside Baty's home; an absence of damage on Baty's bedroom door; and an absence of serious injuries on Zachary. Rasberry testified that Baty told him that Jorgensen approached Zachary's vehicle and was taking stuff out of the back and throwing it on the ground, but Rasberry testified that he saw no evidence of any lawn equipment strewn about. Baty admitted that Jorgensen was someone who fought with his hands and that Jorgensen was never known to use a weapon in a fight.

Rasberry told Baty that a self-defense case would be better if the victim had a weapon. Rasberry testified that he conducted a second interview with Baty because of his on-scene investigation, the autopsy report, and his interviews with Zachary and Luken which provided contradictions to Baty's first interview. Rasberry learned that Luken had been at the scene but left prior to law enforcement's arrival, and Baty

6

and Zachary knew that. Rasberry believed that Luken left the scene because he fired a weapon during the incident, physically assaulted Jorgensen with a knife, and had seven open felony warrants. Baty did not tell Rasberry in his first interview that he saw Luken fire a shotgun.

Rasberry conducted the second interview with Baty after he was arrested. Baty waived his *Miranda* rights. The second interview was played for the jury. The reporter's record indicates that the file was played but the recording was not transcribed by the reporter. At the end of the recording, Baty states, "I think I'm gonna stop the interview." Rasberry responded, "That is your right." Baty then says, "I need a court appointed attorney. Can I make a phone call?" Rasberry responds, "You'll be able to make a phone call when you're booked in." Rasberry then says, "I'm gonna stop the interview now."

After conducting the second interview, Rasberry did not believe Baty acted in self-defense. Baty recalled in the second interview that Luken was in the house, but he said he did not remember Luken firing the shotgun. Crime scene photographs show a shotgun blast had impacted the doorframe to the residence, which law enforcement believed to be the one fired by Luken. Another photograph depicts Luken's bedroom with a shotgun impact on a dresser drawer. Rasberry learned that Luken was the second shooter. According to Rasberry, two shooters would not lend weight to a self-defense claim. Baty had said that Jorgensen was near the dining

7

room table and kitchen island in the residence when Jorgensen charged Baty and he had to shoot him.

The prosecutor asked Rasberry about the 21-foot rule. Rasberry testified that Baty "would have to be extraordinarily fast to be able to make that reaction and decision and take action within the size of about fourteen feet or so." The reaction time would be less than a second according to Rasberry. Baty told Rasberry that Jorgensen was retreating and that Baty advanced. Rasberry says the story Baty gave him was as follows: Jorgensen retreated; Baty shot him with a round of buckshot; Jorgensen retreated outside, and the other round missed Jorgensen because it hit the door; Jorgensen is about fifteen feet away and Baty opens the door; Baty says Jorgensen is still arguing with him, and Baty shoots Jorgensen again. In Rasberry's opinion, the events did not amount to self-defense.

Rasberry testified that Baty and Zachary alleged Jorgensen attacked Zachary when they were putting groceries away in a building next to Zachary's truck. Zachary was beaten up by Jorgensen, Baty retreated into the residence and Jorgensen followed him. Jorgensen and Luken had an encounter in the doorway, where Luken was sitting and watching everything unfold. Zachary then entered the house.

On cross examination, Rasberry testified that he did not "100% believe" that Zachary was beaten up. During the course of his interviews, he said that everyone indicated Jorgensen was extremely agitated and angry. Baty, Luken, and Zachary all

8

had guns because they were uneasy with Jorgensen. He testified that Jorgensen was hit with two rounds of buckshot.

*Alvin Ray Zachary*

Zachary and Baty were former lovers who met in prison. Zachary testified that Luken lived on Baty's property with him and Baty. Jorgensen came to live on Baty's property about seven to eight months before he was killed because Jorgensen and his wife were having issues. Jorgensen has assaulted and choked his wife, was arrested, and had a restraining order. Baty bailed Jorgensen out of jail.

Zachary described physical violence between him and Baty and described Baty as "somewhat" of a controlling person. Zachary testified that Baty told him "there was going to be a hunting accident and that's how I was going to be taken care of[]" and Jorgensen was going to be the person who he had the hunting accident with.

Zachary went to prison for aggravated sexual assault. He knew Baty had a similar charge that was a sexual assault charge against a child, and Jorgensen did not like that Baty had that charge. Zachary testified that Jorgensen's last words were, "Why did you touch me?" Zachary opined that when Jorgensen first moved to the property, he did not want to sleep in the same room as Baty. Zachary found Jorgensen's responses "very peculiar, very odd to me." Having watched his sisters

9

get sexually abused, Zachary felt something had happened between Jorgensen and Baty.

Zachary described the night of the incident. He testified that he and Baty returned to the property after purchasing groceries. Baty took the groceries to his "man cave" and Zachary took some of the groceries into the house. Baty yelled at Zachary because Jorgensen threw Zachary's lawnmowers and weed-eaters out of the back of the truck. Zachary came out of the house and recalled seeing Jorgensen "coming out of the air." Jorgensen hit Zachary in the head. Zachary fell to the ground while Jorgensen kicked him in the jaw. Zachary recalls that he thought Jorgensen attacked him because Baty was mad at Zachary for beating him up, and Jorgensen resented Zachary for what he did to Baty.

Jorgensen hit Zachary with his hands and his foot. Baty called to Jorgensen and told him to get off of Zachary. Baty went into the house and Jorgensen followed him. Zachary then went into the house to get his dogs. Jorgensen was in the dining room and Baty was in his bedroom. Zachary testified that Luken was also in the house. Zachary saw Jorgensen banging on Baty's bedroom door, wanting to talk to Baty. Zachary was trying to get all the dogs into his room. Zachary was also helping Luken to get the little dogs put up in case Baty had to shoot, even though Jorgensen did not have a weapon on him. Zachary agreed that Jorgensen never fought with a weapon and that he used his hands to fight. Zachary testified that he thinks Baty shot

10

Jorgensen because "his rampage episodes were escalating[]" "for about a month or two." He thinks that something happened between Baty and Jorgensen and that had a part in Jorgensen's agitation.

Zachary testified that everyone that lived on Baty's property used drugs except Baty. But Baty smoked marijuana and drank a lot. Zachary is currently in prison for a drug charge. Baty drank to the point where he became violent and beat Zachary. Zachary told investigators that Baty gave him a gun and told him, "If you shoot Chris [Jorgensen], make sure you kill him." Zachary was present when Baty gave Luken a gun. Zachary testified that he and Luken were present when Baty stated, "Make sure you shoot Chris, make sure you kill him[.]" Baty said this a few days before Jorgensen was killed.

Zachary testified that the night Jorgensen was killed, he put all of the dogs in Luken's bedroom and lay down on the floor. Luken was standing up with a gun and exited his room with it. He believes Luken fired a gun that night and bullets struck the corner of the door. Zachary told investigators that he was putting up the dogs because he knew what was about to happen, stating, "They're fixing to fill him full of holes[.]" Zachary testified that Baty shot Jorgensen twice.

Zachary testified that the moment Baty shot Jorgensen, Jorgensen said "Why did you touch me?" Zachary also observed Luken cut Jorgensen's throat. When

11

Luken was cutting Jorgensen's throat, he said, "Remember what Ed said. We gotta make sure he's dead."

On cross examination, defense counsel asked questions about Jorgensen's rampages and felony charges. Defense counsel also discussed Jorgensen's methamphetamine habit and asked Zachary if Jorgensen was a "powder keg[,]" "[a]bout to explode[,]" which Zachary responded "Yeah. Yes. Yes, sir. Yes, sir." Zachary described Jorgensen as "mule strong[]" and that if Jorgensen were to get into a physical confrontation with Baty, Baty wouldn't stand a chance against him. Zachary testified that he would have been scared for his safety if he were Baty or Luken when Jorgensen went into the house. He agreed that Baty and Luken were justifiably scared of Jorgensen and what Jorgensen might do and "that was the reason that things ended up going the way that they did." He opined that if Baty had not pulled the trigger, he does not think Jorgensen would have attacked Baty.

*Dr. Bai Yang Xu*

Dr. Xu reviewed the case file and the autopsy performed by another doctor. He testified that Jorgensen had 430 nanograms per milliliter of methamphetamine in his system at the time of his death. Dr. Xu explained that amount is enough to have an effect on the person who took it but did not influence the multiple pellet wounds he received.

12

*Cassandra Zapata*

Cassandra met Jorgensen through her sister and her brother-in-law. In early February, she had problems finding a place to stay. Jorgensen told Cassandra he was going to stay at his dad's property because of issues with his wife and that Cassandra could stay with him. She went with Jorgensen to Baty's property. There were five people that lived on Baty's property: Cassandra, Baty, Jorgensen, Luken, and Zachary.

She testified that Baty and Jorgensen would get along some days and argue a lot of other days. She never saw Jorgensen attack Baty or anyone else on the property. Cassandra spoke with Jorgensen about how he felt about Baty. Cassandra's impression was that Jorgensen "felt a little -- he was angry in a way." "He resented him a little bit for things that had happened in the past." She agrees there was a part of Jorgensen that loved Baty, and Jorgensen would call Baty his dad. "He looked up at him like he was a father figure." However, Baty was not Jorgensen's biological father. Based on the relationship she saw between Jorgensen and Baty during the three months she stayed on Baty's property, she does not believe that Jorgensen would ever lay a hand on Baty. She testified, "Chris was not a violent person." Jorgensen might argue and yell, but he would not physically fight with somebody. Jorgensen would fight if he was pushed to it, but he would not start a fight according to Cassandra.

Cassandra testified about three incidents that occurred on the property that agitated Jorgensen: his cat died, his pillow went missing, and a SIM card in his phone that didn't work correctly. Zachary was involved in the first incident, and Baty was involved in the other two.

On the night Jorgensen was killed, Cassandra heard a gunshot but thought it was normal because people on the property shoot coyotes. She did not hear yelling before the gunshot. Baty told Cassandra that Jorgensen came home that night and was angry that people were "messing" with his truck. Baty told her that Jorgensen ran up to Zachary and began beating Zachary and Luken. Baty then ran inside, and Jorgensen asked Baty, "Are you going to get your gun?" Baty told him, "No." Cassandra testified that Baty "ran inside anyway and went to his room and grabbed his shotgun."

Cassandra is aware that Jorgensen alleged that Baty molested him when he was a child. She had a conversation with Baty about this topic. Baty told Cassandra he was worried because Jorgensen had "threatened to tell people and tell the law about what had happened previously and an incident that had occurred allegedly recently, and that he was worried because it would put him in prison the rest of his life and he didn't want to go to prison for the rest of his life." Baty told her he would go to prison for the rest of his life, "[b]ecause he had previous charges of child molestation charges and that this was basically the same thing."

14

Cassandra described a recent incident where Jorgensen drank so much that he passed out in the pump house. Baty was aware Jorgensen was in the pump house, passed out. Cassandra told Baty that she was going to check on Jorgensen. Baty told Cassandra he was passing by the pump house and that he would check on Jorgensen. The next day, Cassandra saw Jorgensen. Jorgensen was "very upset" with Cassandra, "[b]ecause he felt like I allowed Mr. Baty to go over there and check on him instead of me doing it." She got the impression that Jorgensen was upset. Cassandra asked Jorgensen if Baty touched him. Jorgensen started crying. Jorgensen told her details about what happened in the pump house.

At that point, the relationship between Baty and Jorgensen changed. Cassandra "observed a lot of arguing and Chris yelling, threatening to tell the police what had happened and tell people what had happened." This happened about two weeks before Jorgensen was killed. Cassandra did not observe the fight between Jorgensen and Zachary, she did not see Jorgensen get shot, and she did not hear what was said. She did see Luken on the property earlier in the day but not that evening. Defense counsel did not ask Cassandra any questions.

*Elizabeth May Jorgensen*

Elizabeth May Jorgensen is the decedent's mother. She explained her son was around eight or ten years old when he met Baty at a golf club where Baty was a golf pro. During the time after Jorgensen met Baty, Jorgensen's behavior changed. He

15

became a bit standoffish, withdrawn, and moody. She got a funny feeling when Jorgensen was "chumming up with an older man." She never saw Baty touch Jorgensen inappropriately but believed Baty did. She filed two police reports, but Jorgensen would not disclose anything to law enforcement, so no charges were filed. She also testified that Jorgensen had a problem with using methamphetamine that started after he met Baty.

Elizabeth testified that she "had three husbands that were abusive." She described her husbands as "all abusive to me and just the two boys . . . [.] But Christopher's father was abusive towards Chris and my oldest son." She described the abuse as "the last time that we were there with him, he was chasing after them with a two-by-four. So it was time for me to leave with my children." Jorgensen's biological father "would hit [his brother] more than he would hit Christopher."

She described Baty as "always kind to Christopher, always, and Christopher loved him. And eventually he started calling him dad." That bothered Elizabeth. Later in life, when he was married, Jorgensen confided to Elizabeth that she was right about the suspicions she had about Baty. Defense counsel did not ask Elizabeth any questions on cross-examination.

The defense did not call any witnesses. There is no record of a charge conference and there is no record of any objections to the charge. In its closing argument, the State argued Baty shot Jorgensen, not in self-defense, but

16

intentionally, firing twice as he advanced on Jorgensen, who was retreating from Baty. The State claimed that Baty was worried that Jorgensen was going to go to the authorities about the sexual molestation that occurred when he was a child. With his previous conviction for aggravated sexual assault of a child, Baty "knew a second conviction was mandatory life, and he wasn't going there. That's what the obstruction part is about." The State mentioned to the jury that there was an instruction in the jury charge on extraneous crimes or bad acts and explained that Baty's prior conviction and prison time he served for aggravated sexual assault of a child is relevant to Baty's motive.

In its closing argument, defense counsel pointed out that "everybody on that property, besides my client, was using meth at the time." He emphasized Jorgensen's assault on a family member, Jorgensen's meth use, and Jorgensen's escalating and aggressive behavior the night of the murder. Baty's counsel acknowledged that "he's got a mark on him," "[b]ut that doesn't mean that he did this." Baty argued that this was a case of self-defense, characterizing Jorgensen as "out of control[,]" a "powder keg" who "exploded." He emphasized that Jorgensen "beat one person down, and he scared three grown men to death, two of them shot him. If that's not self-defense, I don't know what is."

The jury returned a verdict of guilty. The jury sentenced Baty to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for a term

17

of life without parole. The trial court pronounced the sentence of the jury, sentencing Baty to life in prison without the possibility of parole.

Baty filed a motion for new trial and request for evidentiary hearing. The motion asserted three grounds for granting a new trial: (1) the verdict is contrary to the law and evidence; (2) trial counsel did not render effective assistance of counsel at the guilt-innocence phase of trial; and (3) a new trial is warranted in the interest of justice. In his motion for new trial, Baty complained that trial counsel's performance was deficient because he failed to object to the admission of prior bad acts of the Defendant and witnesses, including Baty's conviction of a sex offense against a child and registration as a sex offender, Baty's charge of DWI, and Baty's sex offenses committed against Jorgensen that were not prosecuted. The motion was overruled by operation of law.

Baty complains of two issues on appeal: ineffective assistance of counsel and an illegal sentence. We categorize his ineffective assistance of counsel argument into three sub issues: whether Baty received ineffective assistance of counsel when his trial counsel failed to object to testimony concerning extraneous offenses, whether Baty received ineffective assistance of counsel when his trial counsel failed to object when Baty invoked his right to counsel, and whether Baty received ineffective assistance of counsel because of alleged errors in the jury charge.

Issue One: Ineffective Assistance of Counsel

*Standard of Review*

To prevail on a claim of ineffective assistance of counsel, an appellant must meet a two-pronged test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). *Strickland* requires an appellant to show a reasonable probability that, but for his counsel's errors, the outcome of his trial would have been different. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). A reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Failure to meet either *Strickland* prong is fatal to an ineffective assistance of counsel claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

"Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Bone*, 77 S.W.3d at 833 (citation omitted). Appellant must prove there was no plausible professional reason for specific acts or omissions of his

counsel. *Id.* at 836. "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson,* 9 S.W.3d at 813 (citing *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Because the reasonableness of counsel's decisions and strategy often involves facts that do not appear in the appellate record, the record on direct appeal is usually insufficient to support an ineffective assistance claim. *Id.* at 813–14. However, "when no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as [he] did." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (citing *Strickland*, 466 U.S. at 690).

"In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). When the record is silent as to the reasoning behind an alleged deficiency by trial counsel, "we will assume that counsel had a strategy if any reasonable sound strategic motivation can be imagined." *Id.*; *see also Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court . . . will not conclude the challenged conduct constituted deficient

performance unless the conduct was so outrageous that no competent attorney would have engaged in it.").

Generally, unless a record is created in the trial court that allows the attorney who represented the defendant to explain the reasons a case was handled the way it was handled at trial, the record in the direct appeal will not be sufficiently developed for the appellant to meet their burden to establish their attorney provided ineffective assistance of counsel in the trial unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citations omitted).

*Admission of Extraneous Offenses*

"When an ineffective assistance claim alleges that counsel was deficient in failing to object to the admission of evidence, the defendant must show, as part of his claim, that the evidence was inadmissible." *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002). Texas Rule of Evidence 404(b) provides that "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). Texas Rule of Evidence 403 provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury. . . [.]" *Id*. 403.

However, Rule 404(b) also provides that extraneous-offense evidence may be admissible for other purposes, such as showing motive. *Id*. 404(b)(2). In all prosecutions for murder, the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense. Tex. Code Crim. Proc. Ann. art. 38.36(a).

Baty complains that trial counsel's performance was deficient in not objecting to the admission of three extraneous offenses: Baty's conviction for aggravated sexual assault, Baty's alcohol use and current bond for a DWI charge, and Baty's use of marijuana. Furthermore, Baty complains that he received ineffective assistance of counsel when trial counsel failed to object to the admission of evidence regarding physical abuse of Jorgensen by Jorgensen's father. We find that Baty has failed to demonstrate that his trial counsel's performance was deficient in each of these areas.

*Aggravated Sexual Assault Conviction*

Baty's previous conviction for aggravated sexual assault was admissible evidence, so trial counsel's failure to object to this evidence did not fall below an objective standard of reasonableness as failure to object to admissible evidence does not constitute ineffective assistance of counsel. *Agbogwe v. State*, 414 S.W.3d 820,

22

835 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Baty was indicted for capital murder. "As a predicate to charging capital murder, the Penal Code requires that a defendant commit murder as defined under Section 19.02(b)(1)." *Graham v. State*, 19 S.W.3d 851, 853 (Tex. Crim. App. 2000). "The predicate murder is then aggravated to *capital* murder where any one of eight additional circumstances are present." *See id.* Here, the State alleged in the indictment that Baty intentionally committed murder in the course of committing or attempting to commit obstruction or retaliation. *See* Tex. Penal Code Ann. § 19.03(a)(2). Zachary testified at trial that he met the defendant in prison while serving a sentence for aggravated sexual assault of a child. Zapata testified that Baty told her that Jorgensen had threatened to tell law enforcement about Baty's molestation of Jorgensen, and that Baty was worried because it would mean Baty would go to prison for the rest of his life, and Baty did not want to go back to prison. Zachary further testified how Baty told him that if he shoots Jorgensen, that he needed to make sure he killed Jorgensen. Therefore, the evidence was admissible to prove that Baty intentionally killed Jorgensen in the course of committing obstruction or retaliation.

Evidence of Baty's previous conviction for aggravated sexual assault was admissible to prove motive. *See Austin v. State*, 222 S.W.3d 801, 807-08 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Zapata's testimony implied that about two weeks before the murder, Baty molested Jorgensen in the pump house. One

23

plausible theory is that the incident at the pump house triggered Jorgensen to want to report Baty to law enforcement because Baty sexually assaulted Jorgensen again. Therefore, the conviction tended to show why Baty killed Jorgensen and to rebut Baty's theory of self-defense.

*Drug and Alcohol Use*

Next, we turn to Baty's complaint about trial counsel's failure to object to the admission of evidence regarding his alcohol and drug use. At trial, an audio recording of Rasberry's interview with Baty was played where Baty freely admitted to Rasberry that he was currently out on bond for a DWI charge. Additionally, Zachary testified that Baty drank alcohol frequently, to the point where he attempted to beat Zachary, and that Baty used marijuana. Baty argues that the allegations of drug use and alcohol abuse are not connected to the allegations on which Baty was indicted nor were the allegations offered for any permissible 404(b)(2) purpose. Instead, the State used these acts to show that Baty was a bad person generally.

We disagree. Here, trial counsel could have had a reasonable trial strategy for not objecting to this evidence. First, the information about Baty's DWI was offered voluntarily by Baty during his interview with Rasberry, which defense counsel could then use to show Baty's honesty and cooperation with law enforcement. Baty's alcohol use and marijuana use could have been used to demonstrate that Baty was not like the others who were living on his property and Jorgensen in particular, who

24

was using other drugs. Specifically, Jorgensen was high on meth that night, had just beaten up Zachary, and was acting so aggressively that Jorgensen would not stop his own behavior. Because Baty's trial counsel did not object to this testimony, the jury was able to hear that Jorgensen was a heavy user of meth and that in contrast, Baty did not use meth, painting Baty in a better light than others living on the property.

*Previous Abuse by Victim's Father*

Baty argues that testimony from Jorgensen's mother regarding the abuse Jorgensen suffered by his (biological) father was not relevant to any fact issues raised in his trial, that it was not relevant to Baty's guilt or innocence, and that the jury should not have heard that testimony. Baty does not explain how counsel's failure to object to this evidence fits the first *Strickland* prong. The record is silent as to why Baty's trial counsel took or failed to take the complained-of actions. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Trial counsel may have believed that this testimony would aid in attempting to show Jorgensen was a "powder keg." Generally, trial counsel should be afforded the opportunity to explain his actions before being denounced as ineffective. *Bone*, 77 S.W.3d at 836; *see also Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021). The record does not show that trial counsel had an opportunity to respond to the alleged deficiencies Baty now raises. *See Johnson,* 624 S.W.3d at 586; *Bone*, 77 S.W.3d at 836. We strongly presume counsel rendered reasonable professional assistance. *See Ex parte Saenz*,

25

491 S.W.3d 819, 828 (Tex. Crim. App. 2016) (citations omitted) (noting line of cases abiding by the *Strickland* principle of a strong presumption that counsel's conduct was reasonable). Based on the totality of this record, we conclude that Baty failed to establish trial counsel's performance fell below an objective standard of reasonableness and that Baty has failed to satisfy the first prong of *Strickland*. *See Rylander*, 101 S.W.3d at 111.

*Invocation of Baty's rights*

Baty complains that State's Exhibit 1 contained statements by him that invoked his constitutional right to terminate his interview with law enforcement and his right to counsel. In his brief, however, he does not explain how or why trial counsel's failure to object to this statement rises to the level of ineffective assistance of counsel.

"Under the Fifth Amendment, a right to counsel exists as a prophylactic protection of the right to remain silent; in other words, it exists to counteract the inherent pressures of custodial interrogation." *Garcia v. State*, 191 S.W.3d 870, 877 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing U.S. CONST. amend. V and *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)). "An individual may not be penalized for exercising his Fifth Amendment rights when he is under police investigation; evidence of his invocation of his right to counsel is inadmissible as evidence of guilt." *Kalisz v. State*, 32 S.W.3d 718, 721 (Tex. App.—Houston [14th

26

Dist.] 2000, pet. ref'd) (citing *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991) and *Mathieu v. State*, 992 S.W.2d 725, 729 (Tex. App.—Houston [1st Dist.] 1999, no pet.)). "Evidence of an accused invoking his right to counsel 'may indeed be construed adversely to a defendant and may improperly be considered as an inference of guilt.'" *Howard v. State*, 482 S.W.3d 249, 258-59 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Hardie*, 807 S.W.2d at 322; *see also Doyle v. Ohio*, 426 U.S. 610, 619 (1976)).

Baty contends that the admission of the invocation of the right to terminate his interview and his right to counsel was ineffective assistance of counsel under *Strickland*. Even if we presume that had his trial counsel objected, the trial court may have excluded the invocation portion of the recording, this alone does not end the inquiry pertaining to the first-prong, and we do not presume that had the trial court admitted the evidence over the hypothetical objection, the error would have been reversible. *See Kalisz*, 32 S.W.3d at 724 ("[A] reviewing court must first isolate the error and all its effects and then ask whether a rational trier of fact might have reached a different result if the error had not occurred and its effects had not resulted.").

On this record, we cannot conclude Baty's trial counsel's failure to object was "'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed*, 187 S.W.3d at 392 (quoting *Garcia*, 57 S.W.3d at 440). Playing the invocation of

27

rights – which was in the last minute of a forty-seven-minute recording – did not "move[] the jury from a state of nonpersuasion to one of persuasion[]" as to Baty's guilt. *See Wesbrook v. State*, 29 S.W.3d 103, 120 (Tex. Crim. App. 2000). The evidence of Baty's guilt and the evidence to refute Baty's self-defense theory is substantial. For instance, the State presented evidence that Baty had given guns to Luken and Zachary prior to the shooting. The State also presented evidence regarding the "21-foot rule" and provided physical evidence at the crime scene to refute Baty's claim of self-defense. Moreover, there was evidence that there were two shooters and that Baty said in advance that Luken should make sure Jorgensen was dead. The evidence also showed Jorgensen had threatened to report Baty to law enforcement for sexual abuse and Baty did not want to go back to prison because of his previous conviction; Jorgensen's dying words were "Why did you touch me?" The State did not emphasize Baty's invocation of his right to counsel – the only time the jury heard Baty invoke his right to counsel was on the audio interview. Therefore, Baty has failed to satisfy the second *Strickland* prong as he cannot show he was prejudiced by trial counsel's failure to object.

### Jury Charge

Baty argues that his counsel was ineffective for not objecting to three portions of the jury charge: the portion of the jury charge which failed to include a "benefit-of-the-doubt" instruction, the portion of the jury charge which failed to include the

28

word "attempting" in the self-defense instruction, and the portion of the jury charge which did not define "provocation."

The trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see also Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995) (internal citations omitted). "Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id.* In addition to abstract definitions and instructions, the charge must include an application section "that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations . . . specifies the factual circumstances under which the jury should convict or acquit[.]" *Vasquez*, 389 S.W.3d at 366-67.

"Appellate review of purported error in a jury charge involves a two-step process. First, we determine whether the jury instruction is erroneous. Second, if error occurred, then an appellate court must analyze that error for harm." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) and *Abdnor*, 871 S.W.2d at 731). If we determine error in the charge exists but the defendant did not object to the error at trial, we will reverse the conviction only if the error amounts to "fundamental error," which requires an appellant to demonstrate the error resulted in "egregious harm." *See Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985); Tex. R. App. P. 33.1(a).

Had defense counsel objected to the alleged charge errors which Baty complains about on appeal, and had the trial court overruled the objections, Baty would have needed to show some harm on appeal. *See* Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor*, 871 S.W.2d at 731-32; *Almanza*, 686 S.W.2d at 171.

*Benefit-of-the-Doubt Instruction*

Baty complains about the lack of a "benefit-of-the-doubt" instruction in the capital murder charge. The jury charge in this case states:

You must decide whether the State has proved, beyond a reasonable doubt, five elements. The elements are that:

1. On or about the 1st day of May 2022, in Liberty County, Texas;

30

2. The defendant, EDWIN THOMAS BATY, did then and there, intentionally;
3. Cause the death of Christopher Aaron Jorgensen;
4. By shooting Christopher Aaron Jorgensen with a firearm;
5. And EDWIN THOMAS BATY was in the course of committing or attempting to commit the offense of Obstruction or Retaliation[.]

You must all agree on elements 1, 2, 3, 4, and 5 listed above.

If you all agree the State has proved each of the five elements listed above, beyond a reasonable doubt, then you will next consider whether the defendant's conduct was justified under the law of self-defense.

If you all agree the State has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, 3, 4, or 5 listed above, you must find the defendant "not guilty" of Capital Murder.

Should you find the defendant not guilty of Capital Murder, **then and only then** will you next consider whether the defendant is guilty of the lesser-included offense of Murder. (emphasis added)

Baty complains of the emphasized language on appeal, arguing that "this requires the jury to be unanimous in acquittal of Capital Murder before the same jury can consider the lesser included offense of murder." He complains that the jury charge did not include a benefit-of-the-doubt instruction as in *Barrios v. State*, 283 S.W.3d 348, 349-50 (Tex. Crim. App. 2009). Baty argues Section 5.3 of the Texas Criminal Pattern Jury Charge Manual is more appropriate as it allows the jury to consider all offenses in any order they choose, which contrasts to Baty's jury charge that prohibits the consideration of a lesser offense if the jury finds guilt as to the greater offense.

31

"In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense." Tex. Code Crim. Proc. Ann. art. 37.08. "Jury instructions that tell the jury when and how to proceed from deliberating about a greater offense to deliberating about a lesser-included offense are sometimes called 'transitional instructions.'" *Sandoval v. State*, 665 S.W.3d 496, 532 (Tex. Crim. App. 2022). The type of transitional instruction that the trial court gave in this case is often referred to as an "acquittal first" instruction because it requires the jury to acquit Baty on the greater offense before deliberating on the lesser-included offense. *See id.* "[T]he statutory wording of Article 37.08 necessarily means that a 'unanimous finding of guilt on a lesser-included offense necessarily requires a unanimous acquittal on the higher offense.'" *Id.* at 535 (citation omitted).

"Where an offense consists of different degrees, a charge giving the defendant the benefit of a reasonable doubt between the degrees would be proper, and it would be error ordinarily in such case to refuse such a charge when requested." *McCall v. State*, 14 Tex. Ct. App. 353, 363 (1883) (cited with approval by *Barrios*, 283 S.W.3d at 352). The "general rule" has been that a court "must upon the defendant's request give the jury" such an instruction. *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi–Edinburg 1988, pet. ref'd). Failure to include a "benefit-of-

the-doubt" instruction is not harmful to the defendant, however, if the charge as a whole leaves no uncertainty as to how to resolve any doubt. *Id*.

Here, there is no record of a jury charge conference. From this record, there is no request from defense counsel to include a benefit-of-the-doubt instruction at trial. Regardless, we conclude that the omission of the benefit-of-the-doubt language in the jury charge does not satisfy the first prong of the *Strickland* test. The "acquittal first" instruction for capital murder "explicitly informed the jury that murder was an available lesser offense if the jury did not acquit of capital murder." *Sandoval*, 665 S.W.3d at 534. The guilt-stage jury charge was read in its entirety before closing arguments and jury deliberations. *See id.* at 538. Before deliberations began, the jury was aware that the lesser included offense of murder did not require it to believe that Baty committed or was attempting to commit the offense of obstruction or retaliation. *See id.* Obstruction or retaliation was an explicit element of capital murder, so the transitional instruction effectively required the jury to acquit Baty of capital murder, and consider the lesser offense of murder, if it had a reasonable doubt about that one element, which was the sole element that distinguished the two offenses. *See id.* Additionally, the evidence establishing Baty's guilt for the murder of Jorgensen while in the course of committing obstruction or retaliation was very strong. Therefore, Baty has not shown a reasonable probability that even if trial counsel had requested such an instruction, and even if the jury charge had included

33

such an instruction, the outcome would have been different. Therefore, Baty has not satisfied the second *Strickland* prong.

*Self-Defense Instruction*

Baty complains that the jury charge on self-defense was in error because the application paragraph requires the deceased to have been using unlawful deadly force and does not include language that the defense would apply if the deceased was "using or attempting to use unlawful deadly force."

The self-defense portion of the jury charge states:

> You have heard evidence that, when the defendant shot Christopher Aaron Jorgensen with a firearm, the defendant believed his use of deadly force was necessary to defend himself against Christopher Aaron Jorgensen's use or attempted use of unlawful deadly force.

> If you all agree the State has proven Capital Murder or Murder beyond a reasonable doubt, then you will next consider whether the defendant's conduct was justified under the law of self-defense with regard to the offense you believe the State has proven beyond a reasonable doubt.

> . . .

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against one or more person's use or attempted use of unlawful force.

> A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as set out above, and when and to the degree he reasonably believes that such deadly force is immediately necessary to protect himself against another's use or attempted use of unlawful deadly force.

34

The use of force against another is not justified in response to verbal provocation alone.

The use of force against another is not justified if the actor provoked the other's use or attempted use of unlawful deadly force, unless the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and the other nevertheless continues or attempts to use unlawful force against the actor.

A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force.

. . .

"Reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstances as the defendant.

"Deadly force" means force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

The application paragraph of self-defense in the jury charge states:

If you have found that the State has proved, beyond a reasonable doubt, that EDWIN THOMAS BATY, on or about the 1st day of May 2022 committed all of the elements of the offenses of either Capital Murder or Murder as set out above, you will nevertheless acquit the defendant on the basis of self-defense unless you find that the State has proved beyond a reasonable doubt one of the following:

X. The defendant did not believe his conduct was immediately necessary to protect himself against Christopher Aaron Jorgensen's use of unlawful deadly force; or
Y. The defendant's belief was not reasonable; or

Z. The defendant provoked Christopher Aaron Jorgensen's use of unlawful deadly force.

If you find beyond a reasonable doubt that the State has proven any of the above, and you also find beyond a reasonable doubt that the defendant committed all of the elements of either Capital Murder or the lesser-included offense Murder as set out above, you will find the defendant guilty of either Capital Murder or the lesser-included offense of ~~Capital~~ [sic] Murder, as appropriate.

If you find that the State has failed to prove, beyond a reasonable doubt, at least one of the elements X, Y, or Z listed above, or if you have a reasonable doubt thereof, you must find for the defendant on the issue of self-defense, and find the defendant "not guilty" of Capital Murder and the lesser included felony offense of Murder.

If you all agree the State has proved, beyond a reasonable doubt, each of the elements of either Capital Murder or the lesser-included felony offense of Murder, and you also believe, beyond a reasonable doubt, that the defendant did not act in self-defense, you must find against the defendant on the issue of self-defense, and find the defendant "guilty" of the appropriate offense.

The State acknowledges that the jury charge omitted the language of "attempted" in one sentence of the application paragraph but argues that this omission, if read without the entire context of the jury charge, actually increased the burden on the State. The State points out that self-defense is defined throughout the jury charge with the victim's "use or attempted use" of deadly force, and thus the jury was given the proper definition of self-defense.

In criminal cases, the trial court is required to submit a written charge distinctly setting forth the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14; *Walters v. State*, 247 S.W.3d 204, 208 (Tex. Crim. App. 2007). Although

36

the trial court must submit a charge setting forth the law applicable to the case, article 36.14 does not impose a duty on trial courts to sua sponte instruct the jury on unrequested defensive issues. *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). "An unrequested defensive issue is not law applicable to the case." *Taylor v. State*, 332 S.W.3d 483, 487 (Tex. Crim. App. 2011).

The penal code states that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself. Tex. Penal Code Ann. § 9.31(a). Deadly force may be used to defend oneself if he "reasonably believes the deadly force is immediately necessary[]" to protect himself from the use or attempted use of unlawful deadly force. *Id.* § 9.32(a)(2)(A). The penal code defines a "reasonable belief" as one that would be held by an ordinary and prudent man in the same circumstances as the actor. *Id.* § 1.07(a)(42).

Texas courts have held that when a defendant claims self-defense, his rights are fully preserved when a jury charge (1) states that a defendant's conduct is justified if he reasonably believed that the deceased was using or attempting to use unlawful deadly force against the defendant, and (2) correctly defines "reasonable belief." *Bundy v. State*, 280 S.W.3d 425, 430 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing *Valentine v. State*, 587 S.W.2d 399, 401 (Tex. Crim. App. [Panel Op.] 1979)). Furthermore, the Texas Court of Criminal Appeals has held that if the

37

instruction is not derived from the penal code, it is not "applicable law" for purposes of the charge under article 36.14 of the code of criminal procedure. *See Walters*, 247 S.W.3d at 214.

Here, in accordance with the penal code, the trial court's charge instructed the jury: "you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against one or more person's use or attempted use of unlawful force." *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a)(2)(A). Also, in accordance with the penal code, the charge defined "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances." *See id.* § 1.07(a)(42). While the jury charge omitted the language of "attempted use" in one sentence in the application paragraph, the trial court's instructions tracked the statute's definitions regarding self-defense, deadly force, and reasonable belief. *See Bundy*, 280 S.W.3d at 430-431. Under these circumstances, the trial court properly instructed the jury on the issue of self-defense, and the jury charge was not erroneous. *See Walters*, 247 S.W.3d at 214; *Valentine*, 587 S.W.2d at 401; *see also* Tex. Penal Code Ann. §§ 1.07(a)(42), 9.31(a), 9.32(a)(2)(A).

Even if we assume that Baty's trial counsel asked for an instruction on "attempted use" in the application portion of the jury charge on self-defense, the error would be harmless. There is no evidence at trial that shows Jorgensen was

38

attempting to use deadly force by charging Baty. Deadly force requires some type of force that is "capable of causing death or serious bodily injury." Rather, the evidence showed that Jorgensen acted aggressively but was unarmed when he followed Baty into his house; such actions constitute the use or attempted use of force, not deadly force. Without evidence Jorgensen was attempting to use deadly force, Baty cannot show he suffered any harm by the omission of those words from the jury charge, and his claim of ineffective assistance of counsel fails.

*Provocation Instruction*

Baty also complains about the "provocation" instruction in the self-defense portion of the jury charge. On the one hand, Baty seems to complain that the jury charge does not define provocation and that the jury should have been given the proper definition of provocation. On the other hand, Baty complains that the jury should not have been instructed on provocation because there was no evidence of provocation.

"A charge on provocation is required when there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other." *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998). "An instruction on provocation should

39

only be given when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." *Id.* at 514.

Here, the instruction on provocation was most likely surplus. "When the application portion of the jury charge correctly tracks the indictment, the error of giving surplus law in the abstract portion of the charge is not reversible." *Manrrique v. State*, No. 02-19-00458-CR, 2021 Tex. App. LEXIS 7682, at *28 (Tex. App.— Fort Worth Sept. 16, 2021, no pet.) (mem. op., not designated for publication). We conclude that the inclusion of the challenged instruction, even if erroneous, did not cause harm to Baty. Thus, there is no reversible error and Baty cannot show harm under the second prong of *Strickland*.

Having determined that Baty's claims of ineffective assistance of counsel fail the *Strickland* test, we overrule Baty's first issue.

Issue Two: Illegal Sentence in the Judgment

In his second issue, Baty complains that the judgment contains an illegal sentence. The judgment recites that Baty was convicted for the offense of capital murder by terroristic threat/other felony and assessed his punishment as "life with the possibility of parole." Texas Penal Code section 12.31(a)(2) states:

> (a) An individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for life without parole or by death. An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:

40

. . .

> (2) life without parole, if the individual committed the offense when 18 years of age or older.

Tex. Penal Code Ann. § 12.31(a)(2). When the sentence set out in the judgment conflicts with the oral pronouncement, the oral pronouncement controls. *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004). Here, the jury found Baty guilty of capital murder. As required under the Texas Penal Code, the jury sentenced Baty to life in prison without the possibility of parole, and the trial court orally pronounced this sentence. The remedy is to reform the written judgment to conform to the sentence that was orally pronounced. *Thompson v. State*, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003). Therefore, the judgment should be reformed and modified to reflect that Baty was sentenced to life in prison without the possibility of parole.

Conclusion

Having overruled all of Baty's issues, we affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

KENT CHAMBERS<br>Justice

Submitted on January 29, 2026
Opinion Delivered May 27, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

41